Richard P. **ADAMS**, Plaintiff,

v.

**SUPREME COURT OF PENNSYLVANIA et al.**, Defendants.

Civ. No. 80–0361.

United States District Court, M. D. Pennsylvania.

Dec. 9, 1980.

Lewis W. Wetzel, Wilkes Barre, Pa., for plaintiff.

Charles W. Johns, Pittsburgh, Pa., Howland M. Abramson, Philadelphia, Pa., Susan J. Forney, Harrisburg, Pa., Dept. of Justice, for defendants.

NEALON, Chief Judge.

## MEMORANDUM AND ORDER

### I. FACTS

On November 6, 1979, Richard P. Adams of Luzerne County, Pennsylvania, was

elected a district justice.[1] His term was scheduled to last six years. In January of 1980, however, he announced his intention to run for Congress. Pennsylvania law requires a district justice to "resign his office when he becomes a candidate either in a party primary or in a general election for a non-judicial office."[2] The Commonwealth's Judicial Inquiry and Review Board ("Board"), which is charged with responsibility to enforce the rules regulating judicial conduct, decided that Adams's action required him to forfeit his position. See 42 Pa.C.S.A. §§ 2101, et seq. and 3332. In February 1980, the Board petitioned the Pennsylvania Supreme Court for a Rule to Show Cause why the plaintiff's office should not be declared vacant. The Rule was issued. Adams responded by admitting the facts of the allegation and noting that he considered the law in question, Rule 15(E) of the Governing Standards for District Justices, unconstitutional. He also asked that the Rule be dismissed "pending resolution of the Constitutional issue in Federal Court." On the subsequent March 12th, the Supreme Court issued an order holding that Adams's position was "vacant." See Exhibits F, G, H and I appended to Document 20 of the Record.

In this action, which alleges jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343, the former District Justice seeks reinstatement, lost wages, attorney's fees, and invalidation of Rule 15(E). Adams offers four theories for relief. Initially, he contends that the Pennsylvania Supreme Court denied him due process, because it acted on the Rule to Show Cause without a hearing. Second, the complaint portrays the requirement that district justices resign before seeking political office as pre-empted by the constitutional qualifications for members of Congress. Third, Adams labels Rule 15(E) a violation of equal protection, in that it grants lawyers greater access than non-lawyers to electoral office. Finally, the former District Justice claims that his First Amendment right to participation in the political process has been infringed. A review of these various propositions indicates that the defendants must be granted summary judgment. The Pennsylvania Supreme Court's order removing the plaintiff from office bars the instant § 1983 action under the doctrine of res judicata. Moreover, the complainant's constitutional theories are unpersuasive.

## II. PRELIMINARY CONSIDERATIONS

Counsel for the defendants have advanced a number of threshold arguments for dismissal of the suit. These contentions must be examined before the court considers the merits of the case. The claim of mootness fails, because Adams's complaint provides a live controversy and the parties retain an interest in the outcome. United States Parole Commission v. Geraghty, 445 U.S. 388, 395–97, 100 S.Ct. 1202, 1208–1209, 63 L.Ed.2d 479 (1980). Furthermore, no basis exists for finding laches.[3] Yet two of

1. A district justice is a judicial officer formerly designated a Justice of the Peace or Magistrate. For the statutory provisions regulating the position see 42 Pa.C.S.A. §§ 1511, et seq.

2. See Rule 15(E) of the Governing Standards of Conduct for District Justices. 42 P.S. (1980 Supp.).

3. The defendants do not argue that Adams delayed in seeking a federal forum. See n.9, infra. Rather, they charge that he was not sufficiently energetic in pursuing relief before the Pennsylvania Supreme Court's final judgment. Significantly, a long line of cases beginning with Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) has instructed the federal judiciary to refrain from intervention in ongoing proceedings designed to safeguard important state interests. See Moore v. Sims, 442

U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (child custody); Trainor v. Hernandez, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977) (enforcement of welfare laws); Judice v. Vail, 430 U.S. 327, 334–36, 97 S.Ct. 1211, 1216–1217, 51 L.Ed.2d 376 (1977) (contempt proceedings); Huffman v. Pursue, Ltd., 420 U.S. 592, 604–05, 95 S.Ct. 1200, 1208–1209, 43 L.Ed.2d 482 (1975) (public nuisance). Judicial disciplinary actions undoubtedly protect crucial policies of the Commonwealth. The record, moreover, indicates that none of the exceptions to the Younger doctrine apply (e. g., bad faith enforcement, a statute flagrantly unconstitutional in all respects). Thus, any attempt by Adams to gain a federal forum prior to the state adjudication would have almost

the preliminary defenses merit careful review, *viz.*, the judicial immunity of the Pennsylvania Supreme Court and *res judicata.*[4]

## A. Judicial Immunity

Analysis of this question must begin with a recent precedent of major importance. In *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), two citizens groups sued the highest court of Virginia for promulgating and enforcing a bar discipline rule which prohibited attorneys from advertising. The regulation was clearly unconstitutional. *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). A three-judge federal district court ruled for the plaintiffs and enjoined enforcement of the provision. The complainants also received an award of attorney's fees. On appeal to the United States Supreme Court, the defendant raised the question of judicial immunity.

Review of the *Consumers Union* holding requires an understanding of the rather unique methods the Virginia Supreme Court had for enforcing its bar rules. The tribunal not only had the power to write regulations and to decide cases involving their breach, but it also retained the right to initiate proceedings against attorneys suspected of misconduct. Justice White, author of the *Consumers Union* opinion, analyzed each of these functions in assessing the immunity claim. The defendant was found absolutely insulated from suit with regard to the "legislative" action of drafting bar discipline rules. *Consumers Union*, 100 S.Ct. at 1974–75. The second potential immunity concerned the "judicial" power to try cases involving the regulations. Justice White stated that the Court

did not have to decide that issue. *Id.* at 100 S.Ct. at 1975. Rather, *Consumers Union* turned on the defendant's "enforcement" powers. The opinion noted that while district attorneys and similar state officers enjoy an absolute immunity from suits for damages, they are liable in civil rights actions seeking injunctive and declaratory relief. Justice White reasoned that the same principle should apply to the Virginia Supreme Court in its capacity as a prosecutor of unethical lawyers. *Id.* at 1975–77.

*Consumers Union* does not control the instant case, because the procedures employed by the Pennsylvania Supreme Court in disciplining judicial officers are significantly different from those involved in Virginia bar affairs. Specifically, the highest tribunal of this Commonwealth has no "enforcement" function with regard to District Justices who violate the governing code of conduct. All such actions are filed by the Judicial Inquiry and Review Board. 42 Pa. C.S.A. § 3332. The Supreme Court's role is purely adjudicatory; it: (1) reviews the recommendations of the Board, (2) has the option of ordering additional evidence, and (3) renders a final judgment. 42 Pa. C.S.A. § 3333. Therefore, an analogy to the holding of *Consumers Union* is inappropriate. Resolution of the matter hinges on an issue that the latter case intentionally left open, *viz.*, the scope of judicial exemption.

▇▇▇ As previously noted, Adams seeks several different forms of relief. His claim for damages clearly must be dismissed against the Pennsylvania Supreme Court and its justices, because judicial immunity is an absolute barrier to such an award. *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct.

---

certainly been futile, and the plaintiff cannot be faulted for not seeking such relief with greater vigor.

4. The defendants have asserted an additional proposition; namely, the theory that a federal district court lacks jurisdiction to consider issues adjudicated by the highest court of a state. There is some authority for this view. *See Rooker v. Fidelity Trust Company*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362

(1923). Our Court of Appeals, however, has indicated that this concept need not be treated separately from *res judicata*, because the two doctrines reach "substantially the same result." *Roy v. Jones*, 484 F.2d 96, 99 n.11 (3d Cir. 1973). Actually, these two arguments dovetail so closely that the jurisdictional concept will be treated as an aspect of *res judicata*. *See* the paragraph of text accompanying n.10, *infra*.

1099, 55 L.Ed.2d 331 (1978).[5] A contrary situation, however, exists on the matter of the injunctive remedy. For three reasons, the court is inclined to accept the proposition that prospective relief is not blocked by judicial immunity. First, there is strong authority for this conclusion. *Harris v. Harvey*, 605 F.2d 330, 335 n.7 (7th Cir. 1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980); *Heinbach v. Village of Lyons*, 597 F.2d 344, 347 (2d Cir. 1979); *Fowler v. Alexander*, 478 F.2d 694, 696 (4th Cir. 1973); *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 146 (E.D.Pa. 1977). Second, even though *Consumers Union* did not resolve the issue, Justice White noted that the Supreme Court has granted injunctive relief against state judges in several suits in which the judicial immunity issue was not raised. 100 S.Ct. at 1975 n.14. *See, e. g., Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Lastly, this decision conforms with the reasons underlying the principle that judges should be protected from liability. The immunity is based on the conclusion that judicial officers must be free to perform their responsibilities without the fear of adverse "personal consequences." *Stump v. Sparkman*, 435 U.S. at 355–56, 98 S.Ct. at 1104–05. *See also Dennis v. Sparks*, —— U.S. ——, ——, 101 S.Ct. 183, 188, 66 L.Ed.2d 185 (Supreme Court, 1980). Yet prospective relief in the form of declaratory judgment or an injunction does not visit "personal consequences" upon the defendant. On the contrary, it only affects an individual in the conduct of his or her official duties. Thus, an extension of the judicial immunity to the field of prospective relief would not serve the purpose for which the defense was created.[6]

## B. *Res Judicata*

■ The defendants maintain that the doctrine of *res judicata* prohibits this tribunal from reaching the merits of the complaint, because Adams's district justice position was declared vacant by a formal order of the Pennsylvania Supreme Court. The argument places heavy reliance on *Roy v. Jones*, 484 F.2d at 96, a case which superficially resembles the instant situation. The *Roy* plaintiffs were Pennsylvania Justices of the Peace who allegedly compromised their offices by engaging in partisan politics. On the recommendation of the Judicial Inquiry and Review Board, the state Supreme Court suspended them from their responsibilities. The complainants petitioned for reconsideration. When the Supreme Court again ruled adversely, the plaintiffs sought relief from the federal judiciary under § 1983. The Court of Appeals for the Third Circuit, however, affirmed dismissal of the complaint. The majority explained that since the complainants had pursued their constitutional arguments before the Commonwealth's highest tribunal, they "necessarily" received a judgment on the merits. *Id.* at 99. For that reason, the Court of Appeals held that under the principle of *res judicata* the state adjudication precluded any federal action. *Id.* at 98–99.

---

5. This ruling, of course, will not affect Governor Thornburgh, the other defendant in the litigation.

6. In *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976), the Supreme Court recognized an absolute immunity from damages for prosecutors when they conduct activities "intimately associated with the judicial phase of the criminal process." On behalf of the majority, Justice Powell noted that the decision had an unfortunate side-effect: a "genuinely wronged defendant" would be denied "civil redress." The Court, nevertheless, felt that the immunity was crucial to the functioning of the criminal justice system. Interestingly, Justice Powell recognized that the decision was essentially a balancing of "two evils," *viz.*, the respective harm done to society by a cutoff of relief and that wrought by permission for the officials in question to be sued. *See id.* at 427–28, 96 S.Ct. at 993–994. As already discussed, an extension of judicial immunity to prospective relief would not further the goals that led to the recognition of the *Stump* doctrine. In this case, therefore, the balance of two evils predominates in favor of permitting a remedy to exist.

Adams has also requested an award of attorney's fees. *Consumers Union* left the question undecided. 100 S.Ct. at 1975 n.13. The issue would only be ripe in this case if the plaintiff prevailed.

A subsequent holding, nevertheless, has significantly modified *Roy*. In *New Jersey Education Association v. Burke*, 579 F.2d 764 (3d Cir. 1978), *cert. denied*, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978), several groups representing school teachers attacked a number of regulations issued by the State Board of Education. The plaintiffs had originally sought relief in federal court but resorted to the state judiciary when the former tribunal abstained.[7] The New Jersey courts ruled against the complainants on both state and federal grounds. Subsequently, the teachers returned to the federal forum and asserted constitutional arguments, some of which they had not raised before the New Jersey judiciary. The defendants cited *Roy* for the proposition that the state adjudication barred the plaintiffs from further litigation. The argument had limited success.

Speaking for a unanimous panel, Judge Adams explained that acceptance of the defendants' restrictive *res judicata* theory would turn state courts into "quicksand." This conclusion rested on recognition of the fact that plaintiffs who seek vindication of their alleged constitutional rights often have parallel claims under state law. If traditional concepts of *res judicata* applied, then a complainant who litigated state theories in a state forum would also have to pursue all federal arguments there or the contentions would be lost due to the effect of the state judgment. 579 F.2d at 773–74. The Court of Appeals felt that such a doctrine would encourage complainants with parallel claims to forego state remedies in order to preserve a federal forum for their constitutional contentions. Judge Adams declared that such a result must be avoided.

Accordingly, the *Burke* opinion established the following principle:

> In our view, at least where a federal suit is commenced before a decision by the state court, the proper rule is that . . . a state court judgment forecloses a § 1983 litigant from raising grievances in federal court only if such claims have been pressed before, and decided by, a state tribunal. [footnote omitted]

*Id.* at 774. On this basis, the Court of Appeals held that *res judicata* would not preclude the teachers from raising those arguments that they had not advanced during the state litigation.[8]

In the present suit, Adams sought relief from the federal judiciary before the Pennsylvania Supreme Court issued its final order removing him from office.[9] Furthermore, he never "pressed" any of his constitutional claims before a tribunal of the Commonwealth. Indeed, the former District Justice clearly communicated an intention to limit his defense to a federal forum. Accordingly, *res judicata* would not bar the complainant from seeking relief in this court if it were determined that the *Burke* doctrine governs the suit. A careful analysis of the situation, however, indicates that the principle is inapposite.

Significantly, *Burke* was a matter in which the litigants who sought a federal forum were *plaintiffs* at the state level. As previously discussed, the underlying rationale of the opinion was a policy decision that future complainants should not be discouraged from seeking redress in state court due to the adoption of an overly-restrictive *res judicata* rule. The plaintiff in the present suit, conversely, did not initiate the

---

7. The federal district court abstained for two reasons. First, it refused to adjudicate the teachers' constitutional arguments on the grounds that a clarification of state law might obviate the need for such extraordinary relief. *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500–02, 61 S.Ct. 643, 645–46, 85 L.Ed. 971 (1941). Second, the district court felt that abstention was appropriate under *Younger v. Harris. See* n.3, *supra.*

8. The panel distinguished *Roy* by noting that the plaintiffs in that case had fully litigated

their federal claims before the relevant state court. 579 F.2d at 774, n.52.

9. The complaint in the instant suit was filed on April 7, 1980 and, therefore, post-dated the state judgment, which had been signed on the preceding March 12th. Adams, nevertheless, had already sought an injunction preventing enforcement of Rule 15(E) in an action initiated on January 22nd of this year. *See Adams v. McDevitt*, Civil No. 80–0072. It is not clear exactly why the plaintiff brought the present action as a separate suit.

relevant proceedings before the Pennsylvania Supreme Court. On the contrary, his role was much more analogous to that of a defendant. Thus, an application of *res judicata* in this case could in no way deter an aggrieved individual from pursuing state remedies in order to preserve a federal forum. Even more significantly, the complainant in the instant suit presents a question much different from anything considered in *Burke, viz.,* whether a former official of the Commonwealth who was removed from office after a judicial proceeding in which he did not offer a defense may employ § 1983 to launch a collateral attack on the unfavorable ruling. Under the facts of this litigation, he cannot.

*Huffman v. Pursue, Ltd.* involved an attempt to overturn an Ohio court ruling which declared that a certain theater specializing in pornographic films constituted a public nuisance. In reaching a decision, the United States Supreme Court did not specifically consider the issue of *res judicata,* because the party seeking to uphold the state judgment had waived the defense. Ultimately, the majority held that *Younger* abstention precluded federal relief from the Ohio adjudication. 420 U.S. at 605–13, 95 S.Ct. at 1208–1212. The opinion's general discussion of *res judicata,* nevertheless, indicates that the doctrine should be invoked to bar Adams from challenging his removal.

The *Huffman* majority demonstrated considerable hostility to the proposition that state judgments in civil or quasi-criminal matters should be subject to federal review. First, the Court clearly implied that the case would have been dismissed on *res judicata* grounds had the defendants raised the argument. Justice Rehnquist,

the opinion's author, wrote that his reliance on *Younger* was "in no way intend[ed] to suggest that there is a right of access to a federal forum for the disposition of all issues, or that the *normal rules* of *res judicata* do not bar relitigation in actions under 42 U.S.C. § 1983 of federal issues arising in state court proceedings." *Id.* at 606 n.18, 95 S.Ct. at 1209 n.18 (emphasis added). *See also Preiser v. Rodriguez,* 411 U.S. 475, 497, 93 S.Ct. 1827, 1840, 36 L.Ed.2d 439 (1973).[10] Second, *Huffman* at least tacitly endorsed the idea that there is no "civil counterpart to federal habeas [corpus]" and, hence, no jurisdictional basis for a collateral assault on a quasi-criminal or disciplinary judgment issued by a state tribunal. *Id.* at 605–06, 95 S.Ct. at 1208–1209. Lastly, the majority recognized that subsequent federal review of state rulings could be as destructive of state interests as injunctions against ongoing state proceedings. As Justice Rehnquist explained:

> Federal post-trial intervention, in a fashion designed to annul the results of a state trial, also deprives the States of a function which quite legitimately is left to them, that of overseeing trial court dispositions of constitutional issues which arise in civil litigation over which they have jurisdiction.

*Id.* at 609, 95 S.Ct. at 1210. Thus, the same policies of "comity and federalism" which spawned *Younger v. Harris* and its progeny also militate against a rule permitting subsequent review of state disciplinary or quasi-criminal judgments on other than direct appeal or petition to the Supreme Court. In light of *Huffman,* it must be concluded that Adams's attack on the Pennsylvania judgment is barred by *res judicata.*[11]

---

**10.** It should be noted that if the Supreme Court ultimately decides to apply "normal rules" of *res judicata* in § 1983 actions, then it will adopt a position much stricter than that taken by our Court of Appeals in *Burke.*

**11.** A contrary result would be anomolous when compared with the Supreme Court's interpretation of the federal habeas corpus statute, 28 U.S.C. § 2254. In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), a Florida prisoner sought collateral review of his state conviction on the basis of a constitutional

argument he had never used at trial and had, therefore, waived under state procedure. The majority, again speaking through Justice Rehnquist, held that "considerations of comity and concerns for the orderly administration of criminal justice" required that a habeas corpus remedy be denied unless the convict could show that there existed a "cause for noncompliance [with the state procedural requirement of a timely objection] and some showing of actual prejudice resulting from the alleged constitu-

Two other observations are appropriate to this situation. Initially, the instant action must be distinguished from *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), a case in which the Supreme Court examined the constitutionality of a New Hampshire statute that required residents to maintain the state motto "Live Free or Die" on their license plates. One of the plaintiffs, an individual who charged that the slogan violated his First Amendment rights, had been convicted of violating the law on three occasions. The defendants contended that principles of comity precluded the federal judiciary from upsetting the state adjudications. The Supreme Court disagreed. On behalf of the majority, Chief Justice Burger agreed that the *Huffman* rationale normally discourages federal post-trial intervention. In *Maynard*, nevertheless, the complainants sought a limited type of review which rendered that precedent "inapposite." As the Chief Justice explained:

> Here ... the suit is in no way "designed to annul the results of a state trial" since the relief sought is wholly

prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights. Maynard has already sustained convictions and has served a sentence of imprisonment for his prior offenses. He does not seek to have his record expunged, or to annul any collateral effects those convictions may have, e. g., upon his driving privileges. The Maynards seek only to be free from prosecution for future violations of the same statutes. [footnote omitted]

430 U.S. at 711, 97 S.Ct. at 1433. On this basis, the majority found that the plaintiffs could litigate their claims in a federal forum.[12]

Adams, conversely, seeks the very relief that the *Maynard* complainants did not, *viz.*, annulment of the collateral effects stemming from the state adjudication. The former District Justice desires restoration of his office. In order to grant such a remedy, it would be necessary to invalidate the Pennsylvania Supreme Court judgment and all of its consequences. Accordingly, *Maynard* is inapplicable. *Cf. Schuman v. Muller*, 484 F.Supp. 1334, 1337 (E.D.Pa.1980).

tional violation." *Id.* at 84, 97 S.Ct. at 2505. The court gave three basic policy reasons for this decision, *viz.*, to discourage: (1) "sandbagging" (*i. e.*, the intentional withholding of timely objections for tactical advantage), (2) laxity on the part of state judiciaries in enforcing their own procedural deadlines, and (3) any derogation "from the perception of the trial of a criminal case in state court as a decisive and portentious event." *Id.* at 89–90, 97 S.Ct. at 2507–2508.

It is conceded that an analogy to *Sykes* is cross-doctrinal, because *res judicata* does not apply to habeas corpus litigation. Nevertheless, a decision permitting Adams to litigate the merits of his claim in this court would contravene the same considerations of "comity" and federalism that gave rise to the latter holding. "Sandbagging" would certainly be encouraged. Indeed, Adams's entire strategy has been a bypass of objections before the Pennsylvania Supreme Court in order to gain some perceived advantage in a federal forum. Second, recognition of the plaintiff's argument would also encourage state judicial bodies to relax their timely objection rules in order to reach constitutional propositions. As *Sykes* explained, the undesirable alternative would be to permit federal resolution of the entire case without an indication of the state's views on the merits. Finally, collateral examination of Adams's removal

would largely emasculate any perception of the Pennsylvania adjudication as a "decisive and portentious event" by demonstrating that the Commonwealth's proceeding could be ignored in many instances. This deprecation would occur even though such disciplinary actions safeguard vital state interests which merit the "greatest respect." *See Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295, 302 (5th Cir. 1977).

The record indicates that the former District Justice could never pass the "cause and prejudice" test necessary to gain a federal forum under *Sykes*. Consequently, this court could only hear his case if collateral review in state civil decisions were actually *broader* than that allowed criminal judgments. There is no basis for such a conclusion. Indeed, *Huffman*'s tacit observation that there is "no civil counterpart to federal habeas [corpus]" demonstrates that the opposite is true.

12. As in *Huffman*, the *Maynard* Court viewed this issue from the perspective of *Younger* abstention rather than *res judicata*, apparently because the defendants chose not to pursue the latter argument. This court, however, feels that the logic of *Maynard* is fully applicable to the question of *res judicata* as an extension of the *Huffman* analysis.

Second, the court wishes to emphasize that *res judicata* is a flexible concept and, for that reason, it should not be applied in certain circumstances. In *Bickham v. Lashof*, 620 F.2d 1238 (7th Cir. 1980), for example, a doctor filed a § 1983 suit which attacked the validity of an Illinois statute regulating abortion. The defendants, who were charged with enforcement of the provision, had previously brought a state judicial action to enjoin the physician from performing abortions at his clinic. During the Illinois proceeding, the doctor had unsuccessfully challenged the constitutionality of the law. The defendants felt that the state ruling barred the § 1983 litigation under *res judicata* or collateral estoppel. The Court of Appeals for the Seventh Circuit, however, concluded that the Illinois tribunal treated the constitutional contentions in so cursory a manner that the physician was not afforded a "meaningful hearing." On this basis, the *Lashof* panel held that federal adjudication was appropriate.[13] Consequently, the facts of a particular case may require an exception to the normal functioning of *res judicata*.[14]

## III. THE MERITS

This case, of course, could be decided entirely on the basis of the *res judicata* ruling. The ultimate result, however, would not have changed even if the court had found it imperative to address each of Adams's constitutional propositions.

### A. Due Process

According to the plaintiff, the Pennsylvania Supreme Court denied him due process of law when it acted summarily on the Rule to Show Cause. The problem with this argument is that there was no reason to hold a hearing, because Adams admitted the basic facts contained in the allegation. As Chief Justice Burger noted in *Wolff v. McDonnell*, 418 U.S. 539, 571–72 n.19, 94 S.Ct. 2963, 2982 n.19, 41 L.Ed.2d 935 (1974), the Due Process Clause provides "minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction." Here, the "factual predicate" was conceded and, hence, there was no need to guard against an "arbitrary determination." All that remained was a question of law which the former District Justice refused to address even though the issue was properly before the Pennsylvania Supreme Court. He can no more allege a violation of due process than could an individual who suffered an adverse ruling of summary judgment after neglecting to oppose the movant's factual allegations and legal theories.

### B. Pre-emption

Adams's proposition that the constitutional requirements for a member of Congress pre-empt Rule 15(E) is also unconvincing. The Supremacy Clause invalidates any state legislation "explicitly or implicitly"

---

**13.** Two primary indicia convinced the Court of Appeals that the *Lashof* plaintiff had not received a "meaningful hearing" on his constitutional contentions. First, the state tribunal had not directed the parties to brief the federal issues. Second, the oral argument on the constitutional questions did not treat the matter adequately. The record in the present case indicates that Adams waived the right to present a brief or additional evidence to the Pennsylvania Supreme Court.

The court realizes that *Lashof* contains dicta which suggests that the *Burke* rule extends to situations in which the litigant seeking a federal forum was a defendant in a previous state disciplinary or quasi-criminal proceeding. 620 F.2d at 1246. This language, nonetheless, does not contain a convincing analysis of *Huffman*

or the policies underlying *Burke*, and it will not be applied here.

**14.** *Fernandez v. Trias Monge*, 586 F.2d 848 (1st Cir. 1978) was another instance in which *res judicata* was not enforced. The decision partially relied on the following rationale:

.. In addition, in many trials of less serious criminal matters, the state court may be of limited jurisdiction with informal, non-adversarial procedures and inadequate record-keeping. Imposing the res judicata bar for failure to raise a substantial constitutional claim in that type of forum would not best serve the interests of either local or federal judicial systems.

*Id.* at 855.

prohibited by federal law. *Ray v. Atlantic Richfield Company*, 435 U.S. 151, 157–58, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). As already noted, Rule 15(E) concerns a crucial state interest, *i. e.*, integrity of the judiciary. There is not the slightest indication that the constitutional provisions establishing the various requirements for Senators or Representatives were ever intended to preclude the Commonwealth from providing that candidates for such offices must forfeit state judicial posts.

The plaintiff places heavy reliance on *Stack v. Adams*, 315 F.Supp. 1295, 1297–98 (N.D.Fla.1970), a three-judge court decision which found pre-emption in a situation very similar to the instant case. That precedent is unpersuasive. The *Stack* panel listed *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) as its main authority. The latter case concerned the power possessed by the House of Representatives to judge the qualifications of its members. Nothing in *Powell* even vaguely hinted that the authors of the Constitution intended to prevent the states from unseating judicial officers who decide to run for Congress. Several opinions have cited *Stack* favorably. *See Mancuso v. Taft*, 476 F.2d 187, 200 n.18 (1st Cir. 1973); *Dillon v. Fiorina*, 340 F.Supp. 729, 731 (D.N.M.1972) (three-judge court). A subsequent Supreme Court ruling, nonetheless, has undercut whatever validity these cases may have ever had.

■ *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1973) involved the constitutionality of a California election law which in part denied a place on the ballot to independent candidates who had been registered with a "qualified political party" at any time during the year preceding the election. Two of the plaintiffs, former candidates for Congress who had been refused ballot positions on the basis of this statute, repeated the *Stack* argument. They contended that the disaffiliation provision placed another "qualification" on potential Congressmen and, for that reason, was pre-empted. The Supreme Court found this theory "wholly without merit."

*Id.* at 746, 94 S.Ct. at 1286. Rule 15(E) safeguards state interests at least as great as those protected by the California election law challenged in *Storer*. In practical terms, moreover, the burdens the Pennsylvania enactment places on a potential candidate for Congress are not significantly greater than the disaffiliation rule. Thus, there is no basis on which to conclude that Rule 15(E) is unconstitutional. *See also Williams v. Tucker*, 382 F.Supp. 381 (M.D. Pa.1974) (three-judge court).

## C. *Equal Protection*

The complainant's invocation of equal protection is misplaced. Rule 15(E) prohibits district justices from seeking "non-judicial" posts. The natural corollary to the provision is that such officers may maintain their positions if they run for a seat on the Pennsylvania bench. Adams notes that the Commonwealth only permits lawyers to be judges. For that reason, he insists that Rule 15(E) unduly favors attorneys by permitting them to retain district justiceships while seeking a broader scope of elective offices than non-lawyers. This reasoning is flawed.

■ It must be borne in mind that Adams's complaint concerns the rule requiring district justices to forfeit their positions when they run for the House of Representatives, a non-judicial office. This enactment also applies to attorneys. Under Rule 15(E), the Pennsylvania Supreme Court would have stripped Adams of his office once he announced his candidacy for Congress even if he had been a member of the bar. The provision only grants lawyers special treatment when they run for the bench, and the plaintiff has never intended to seek such a post. Thus, the sole disparity that exists is totally irrelevant to this litigation. Since this case does not involve any tangible discrimination on the part of the Commonwealth, the complainant has no remedy under the Equal Protection Clause. *Burns v. Swenson*, 430 F.2d 771, 778 (3d Cir. 1970), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972).

**1292**

### D. *The First Amendment*

Finally, the plaintiff challenges Rule 15(E) as an unacceptable burden on his First Amendment right to engage in political activity. He argues that the provision is unconstitutional unless the defendants can demonstrate that the "resign to run" rule furthers a compelling state interest. The court cannot agree.

▮ The relevant authorities provide that federal and state officials may regulate the First Amendment rights of various government employees to an extent greater than is appropriate for regular citizens. The issue is not whether a "compelling state interest" supports the relevant law. Rather, the proper test involves a balance between the individual's First Amendment rights and the interests the government has at stake. *Broadrick v. Oklahoma*, 413 U.S. 601, 606, 93 S.Ct. 2908, 2912, 37 L.Ed.2d 830 (1973) (state civil service); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973) (federal civil service); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1969) (public school teachers); *Blameuser v. Andrews*, 630 F.2d 538 at 542–543 (7th Cir. 1980) (military officers). In *Morial v. Judicial Commission of the State of Louisiana*, 565 F.2d at 299–303, the Court of Appeals for the Fifth Circuit held that this principle extends to state judicial officers. Furthermore, the precedent provided the rationale for resolving Adams's argument.

▮ It must be conceded that "resign to run" laws place substantial burdens on a potential candidate's right to seek office. Yet the "chilling" effect of these provisions should not be exaggerated, since they do not reach a wide variety of other activities protected by the First Amendment guarantee of free speech. The statutes, moreover, serve important state interests. For example, they help prevent the abuse of judicial

office by candidates and former candidates and they safeguard the appearances of propriety. Finally, as the *Morial* court noted, the less-restrictive alternative of a forced leave of absence would not be sufficient to guard the state's interests, because the danger of corruption, real or perceived, would persist with regard to defeated candidates on their return to the bench.[15] Weighing these considerations, it must be concluded that the *Morial* analysis is compelling and the "resign to run" law is constitutional.

### IV. SUMMARY

In conclusion, the defendants must be granted summary judgment. Adams's arguments can be rejected for a variety of reasons. As previously noted, his claim for damages against the Pennsylvania Supreme Court must be dismissed on the basis of judicial immunity. *Res judicata*, moreover, bars the rest of his claims. Also, his constitutional claims fail on the merits. This matter shall be resolved by the entry of judgment on behalf of the defendants under Federal Rule of Civil Procedure 56.

---

**15.** Adams attempts to distinguish *Morial* on the grounds that the rationale of the Pennsylvania law has not been enunciated. The Comments to Rule 15(E), nevertheless, state that the provision is derived from the American Bar Association Canon of Ethics and the Pennsylvania Supreme Court Code of Judicial Conduct. The Pennsylvania law, therefore, can be seen as furthering the same goals as that of Louisiana.