Robert STERN, Plaintiff-Appellee,

v.

Kenneth SHOULDICE, et al., Defendants-Appellants.

No. 81–1156.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 2, 1982.

Decided April 15, 1983.

Rehearing Denied June 20, 1983.

See also, 6th Cir., 708 F.2d 728.

Raymond Clevenger, Donald E. Shelton, Ann Arbor, Mich., Bryon H. Higgins (argued), East Lansing, Mich., for defendants-appellants.

Nino Green (argued), Escanaba, Mich., for plaintiff-appellee.

Before KEITH and CONTIE, Circuit Judges, and MORTON, Chief District Judge.[*]

CONTIE, Circuit Judge.

This is the rehearing of an appeal by Dr. Kenneth Shouldice and Dr. Leon Linderoth of a district court judgment rendering them liable for instigating the termination of Dr. Robert Stern, an assistant professor of speech and drama at Lake Superior State College in Michigan. Stern sued under 42 U.S.C. § 1983, alleging that he was denied academic tenure in retaliation for exercising first amendment rights. The jury awarded damages to Stern in the amount of $2.00 against Linderoth and $1.00 against Shouldice. Pursuant to equitable powers, the trial judge assessed $45,696.00 back pay against Shouldice and Linderoth in their individual capacities. The court later granted Stern $15,585.22 in prejudgment interest and $23,158.55 in costs and attorney's fees. Although we affirm the assessment of nominal damages, costs and attorney's fees, we reverse the award of back pay and pre-judgment interest.

I.

Lake Superior State College became an independent academic institution on January 1, 1970. Though governed by an eight-member Board of Control, the College's chief executive officer was defendant

---

[*] The Honorable L. Clure Morton, Chief Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

Shouldice, its president. Defendant Linderoth headed the Arts and Letters division. Robert Stern, the plaintiff, joined the faculty in September, 1967. During his sojourn at the College, Stern served on the Faculty Senate and on the Administrative Counsel, the highest administrative body on campus. Stern also became president of the local chapter of the American Association of University Professors (AAUP).

This litigation resulted from Stern's claim that he was denied tenure in retaliation for exercising first amendment rights on two separate occasions. The first situation concerned an article, written by Professor Kaplan of the University of Michigan, which appeared in the *AAUP Michigan Newsletter*. Kaplan authored the piece after visiting the College in December, 1969. A draft of the article, which was somewhat critical of Shouldice and the College in general, was submitted to the College's chapter of AAUP so that the latter could correct any inaccuracies. The group suggested minor changes and returned the draft. Just before publication in January, 1970, Kaplan sent a copy of the revised article to Shouldice. Believing that the piece contained serious factual errors, Shouldice met with Stern who in turn suggested that the president call Kaplan. Shouldice did so but was told that the article had already gone to press.

Shouldice was concerned about adverse publicity because the College had only recently achieved independence and because the school was competing for qualified faculty in what was then a scarce market. He therefore wrote a reply to Kaplan's article, but the *AAUP Michigan Newsletter* never published it. Furthermore, after reading a statement by Stern in *The Compass,* the campus newspaper, to the effect that the AAUP only censured a school after careful investigation, Shouldice wrote to Stern that "in light of recent events, this is a very shallow statement. The inference of purity usually should be matched with personal action to support it."[1] Subsequent to the

article's publication, Shouldice asked the Faculty Senate to replace Stern as the Senate's representative to the Administrative Counsel. In May, 1970, Linderoth orally informed Stern that he would not be recommended for tenure when the appropriate time arrived. Nevertheless, Stern was reappointed for the 1970–71 academic year.

Stern asserts in his complaint that he was denied tenure partially because the Kaplan article criticized the College. Defendants counter that plaintiff was discharged because he associated poorly with colleagues and because his talents did not comport with proposed curriculum changes. In addition, Stern's involvement with the Kaplan article supported the tenure decision not because the administration was attempting to quell dissent, but because Stern's failure to correct purportedly obvious factual errors when given the opportunity to do so indicated personal immaturity or lack of competence not desired of tenured faculty members. Stern is said to have been privy to the facts because of his positions on the Faculty Senate and on the Administrative Counsel.

The second incident involved a student who drove a College car to Canada without permission in July, 1970. Canadian officials impounded the auto after finding marijuana inside. After meeting with the student, Shouldice terminated his summer job on campus. Following a hearing, the Dean of Students suspended the youth from school. The student then contacted Stern, his school-appointed faculty advisor. After listening only to the former's story, Stern opined that the student may have been summarily expelled and suggested that he seek legal advice. The student did so and was subsequently readmitted to the College. Shouldice then wrote a letter to Stern which criticized the latter's handling of the matter.

Stern alleges in his complaint that he was denied tenure in retaliation for exercising his first amendment right to advise a stu-

---

**1.** Plaintiff stressed at trial that Kaplan's article was not a formal censure. The record reflects that AAUP censures must be approved by the national organization rather than by state or local affiliates.

dent to seek legal counsel. Defendants assert that the episode was relevant to the tenure decision not because Stern suggested that the student take possible legal action against the College, but because Stern's failure to check with either the Dean of Students or the youth's file before concluding that no procedural protections had been afforded was proof that Stern undertook his counselling duties in a cavalier or immature fashion.

In May, 1971, Linderoth informed both Stern and Dr. Light, vice president for academic affairs, that Stern would not be recommended for tenure because of his uncooperative attitude and because of his lack of expertise in drama theory. The three men met on May 13, 1971 at which time Stern requested that his case be heard by the tenure committee. Although Light recommended to Shouldice that Stern be denied tenure, the latter asked the committee to review the matter. Finding an irreconcilable conflict between Linderoth and Stern, the committee stated that the reasons given for discharging Stern had not been refuted. Upon receiving this report, Shouldice notified Stern that he would not be retained after the 1971–72 academic year.

The Board of Control subsequently approved this decision. Stern then requested an opportunity to present his case directly to the Board. The Board permitted him to submit a lengthy document in his defense and also invited his attorney to make comments at a Board meeting. The Board again approved the denial of tenure on November 19, 1971.

At trial, the jury returned a general verdict in favor of the College but against Shouldice and Linderoth in their individual capacities for nominal damages. Pursuant to an agreement of the parties, the back pay issue had not been submitted to the jury. The court found the verdict inconsistent with the answer to an accompanying interrogatory. Upon resuming deliberations, the jury conformed the interrogatory answer to the general verdict.

Exercising equitable powers, the court awarded back pay against Shouldice and Linderoth as individuals. Judgment was properly entered on September 23, 1980. Defendants timely filed post-judgment motions for j.n.o.v., for a new trial and to amend the judgment. Stern filed a motion for prejudgment interest, costs and attorney's fees. In an opinion rendered on January 15, 1981, the court denied defendants' motions and granted plaintiff's motion. The judgment for interest, costs and attorney's fees was entered February 12, 1981. Defendants filed their notice of appeal on March 6, 1981.

## II.

The first issue requiring discussion is whether defendants' notice of appeal was timely filed. Because our treatment of Stern's motion for pre-judgment interest, costs and attorney's fees disposes of this issue, we do not discuss the effect of defendants' motions.

Since Federal Rule of Appellate Procedure (FRAP) 4(a)(1) mandates that appeals be filed within thirty days after entry of judgment, defendants' notice of appeal normally would have been due on October 23, 1980. Since Stern filed a post-judgment motion, however, we must consider the effect of FRAP 4(a)(4) which provides in part that the thirty-day appeal period for all parties runs from the date of entry of the order granting or denying a Federal Rule of Civil Procedure (FRCP) 59 motion for amended judgment. FRAP 4(a)(6) states that such a judgment is "entered" when there is compliance with FRCP 58 and 79(a), i.e., a separate document is entered on the docket. In the present case, the assessment of pre-judgment interest, costs and attorney's fees was entered for purposes of FRAP 4(a)(6) on February 12, 1981. The notice of appeal was filed on March 6, 1981. Consequently, if granting pre-judgment interest, costs and attorney's fees constituted a Rule 59 amendment of judgment, defendant's appeal was timely.

Although the Supreme Court has recently held that costs and attorney's fees should be

granted under FRCP 54(d) rather than under FRCP 59, *White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), defendants contend that the assessment of over $15,500.00 in pre-judgment interest on the back pay claim was obtainable only under the latter rule. Stern counters, however, that pre-judgment interest was available under FRCP 60(a)'s provisions governing clerical errors.

The third circuit has held that if a party is entitled to pre-judgment interest as a matter of right, the judgment can be corrected under FRCP 60(a). *Glick v. White Motor Co.,* 458 F.2d 1287, 1293–94 (3rd Cir. 1972). On the other hand, if granting pre-judgment interest is discretionary, the judgment must be amended pursuant to FRCP 59. *See Scola v. Boat Frances, R., Inc.,* 618 F.2d 147, 152 (1st Cir.1980). Stern argues that he was entitled to pre-judgment interest as a matter of right. The district court found that Stern's request for back pay was a liquidated claim. This court has held that pre-judgment interest "runs as a matter of right on a liquidated claim." *Bituminous Casualty Corp. v. Lynn,* 503 F.2d 636 (6th Cir.1974). Thus plaintiff concludes that the original judgment was correctable under FRCP 60(a) and that defendants' appeal was untimely.

Though Stern's argument is not without force, we must reject it. This court recently held in *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988, 990 (6th Cir.1982), that "in the absence of a statutory provision the award of pre-judgment interest is in the discretion of the court." As a result, whether or not a claim is liquidated is inconsequential. Moreover, even were the liquidated-unliquidated distinction applicable, the *Taiariol* case involved a plaintiff's liquidated claim for money contractually owed to a pension fund. In light of this court's more recent authority, we hold that a grant of pre-judgment interest pursuant to a post-trial motion is discretionary with the trial court and requires an amendment of judgment under FRCP 59. *See Chicago & Northwestern Railway Co. v. Union Packing Co.,* 527 F.2d 592 (8th Cir.1976).

Since defendants filed their notice of appeal within thirty days after entry of the amended judgment, this appeal is timely.

### III.

■ The plaintiff alleges that tenure was denied because he criticized both Shouldice and the College.' While public educational institutions generally are entitled to wide latitude when making tenure decisions, a professor or teacher may not be denied tenure in retaliation for constitutionally protected speech. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Manchester v. Lewis,* 507 F.2d 289 (6th Cir. 1974). When a plaintiff alleges a violation of this right, the claim is governed by the procedure set forth in *Mt. Healthy.* According to that decision, the plaintiff must first prove that he engaged in constitutionally protected activity. Secondly, he must demonstrate that such activity was a substantial or motivating factor in the determination to discharge him. The teacher or professor having thus established a *prima facie* case, the burden then shifts to the school to show that it would have denied tenure to the plaintiff even in the absence of the protected activity. Put another way, if the finder of fact determines that the plaintiff would have been retained but for the exercise of first amendment rights, the discharge was based upon constitutionally impermissible grounds.

■ The question of whether or not Stern's speech was constitutionally protected was a question of law for the district court. *Hildebrand v. Board of Trustees, Michigan State University,* 662 F.2d 439 (6th Cir.1981), *cert. denied,* 102 U.S. 1760, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982); *Daulton v. Affeldt,* 678 F.2d 487 (4th Cir.1982); *Bernasconi v. Temple Elementary School District,* 548 F.2d 857 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1977). The court therefore erred in sub-

mitting this issue to the jury.[2] Though the defendants apparently did not object to this procedure, the court committed plain error. *Schneider v. City of Atlanta,* 628 F.2d 915 (5th Cir.1980). This court must therefore decide whether the activities engaged in by Stern fall within the ambit of the first amendment.

■ In regard to the article printed in the *AAUP Michigan Newsletter,* we hold that because Kaplan wrote the article, plaintiff did not engage in protected speech. Since the article summarized Kaplan's post-visit impressions of the College, the piece contained his speech as opposed to the plaintiff's. That Stern belonged to a local chapter of AAUP which suggested minor changes that were incorporated into the article does not transform Kaplan's article into Stern's speech. Therefore, under the facts of this case, Stern's review of the article did not constitute such participation in the preparation of the article so as to accord him first amendment protection.

■ We do hold, however, that counseling the student to seek legal advice about the suspension was protected under the first amendment. The analysis of this question is controlled by *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), in which it was held that courts must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." In achieving this balance, courts should consider whether an employee's comments meaningfully interfere with the performance of his duties or with the employer's general operations, create disharmony among co-workers, undercut an immediate supervisor's discipline over the employee or destroy the relationship of loyalty and trust required of confidential employees. *Id.* 569–70, 88 S.Ct. at 1735.

None of these problems occurred in this case. The record is devoid of evidence that Stern's counseling adversely affected his teaching, caused problems among other faculty members or undermined the authority of Linderoth as the head of the Arts and Letters Division. Nor was Stern a confidential employee of Shouldice or Linderoth as that term is used in *Pickering.* Finally, Stern's advice did not disrupt College operations in general. Precisely the opposite appears to have been true; for after the student sought legal counsel, the matter was smoothly resolved by readmitting the student subject to certain restrictions on participation in extra-curricular activities.

■ Defendants contend that the incident was properly considered in denying tenure not because Stern criticized the College but because he inadequately investigated the situation before giving advice.[3]

**2.** The trial judge instructed the jury as follows: The fourth element which the plaintiff must establish is that in his activities as an officer and/or member of the Lake Superior State College Chapter of the AAUP and/or in his activities in assisting and counseling [the student] in connection with the disciplinary action taken against him, he was exercising his constitutionally protected right of freedom of speech under the first amendment. . . .
This means that citizens of the United States enjoy a broad freedom to speak out and to join associations or groups to make their views known. These rights, however, are not absolute. In determining whether the plaintiff's involvement in the AAUP incident or the [student] incident was constitutionally protected you must strike a balance between the interest of the plaintiff in commenting upon matters of public concern with respect to the AAUP incident and in counseling an expelled student . . . . against the College's interest in promoting the efficiency of its services through its employees. By weighing these competing values you must determine whether first amendment considerations preclude termination of the plaintiff because of his involvement in either or both of the foregoing incidents.

**3.** Defendants claim that *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), is relevant to this question. We disagree. *Givhan* held that where an employee privately confronts his public employer/supervisor, the time, place and manner of speech should be considered together with the content of the speech in determining whether first amendment protection exists. Since Stern did not

This allegedly tended to show that Stern lacked the deliberative qualities desired of a professional scholar. *Cf. Weisbrod v. Donigan,* 651 F.2d 334 (5th Cir.1981) (speech may be indicative of undesirable personality traits for which an employee may be discharged). This argument must fail however. Having found Stern's speech to be protected, we hold that it was a question for the jury whether the defendants were motivated to terminate Stern in retaliation for his speech or in an attempt to rid the College of an unqualified professor. *Mt. Healthy, supra.* The jury found against the defendants on this point in an interrogatory and we will not disturb its decision.

■ Shouldice and Linderoth next claim that even if Stern's speech merited first amendment protection and even if it were established that Stern would not have been discharged absent his exercise of that right, defendants are entitled to qualified immunity. The Supreme Court recently modified the qualified immunity test in *Harlow v. Fitzgerald,* — U.S. ——, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Defendants contend that because first amendment law in this area was only beginning to develop in the early 1970s and because the *Pickering* test required courts to balance various factors in each case, no person could reasonably predict in a given situation whether discharging an employee would violate the latter's first amendment rights. Shouldice and Linderoth therefore claim that they did not infringe upon Stern's clearly established constitutional rights.

We disagree. The *Pickering* case, which was decided before this dispute arose, clearly established limits on a public employer's freedom to prohibit or regulate employee criticism. The court also delineated the factors that lower courts were to consider when addressing future cases. As has been indicated, a straightforward application of these factors demonstrates that Stern's counseling activities were protected. We therefore hold that a reasonable person should have known in 1970–71 that Stern's speech was constitutionally protected under *Pickering.* Shouldice and Linderoth are not entitled to immunity.

### IV.

■ Defendants assert that the district judge committed several other errors during trial. They first contend that the court should have granted summary judgment against the plaintiff because the Board approved the denial of tenure after conducting its own hearing. Defendants argue that an independent review of the case by the Board would as a matter of law sever the casual link between Shouldice's and Linderoth's improper conduct and Stern's discharge. The short answer to this objection is that it was for the jury to determine whether the Board was improperly motivated or whether Shouldice's and Linderoth's tainted recommendations substantially affected an otherwise independent Board determination. Since defendants had the opportunity to present this theory to a jury who rejected it, we find no error.

■ Secondly, defendants contest the exclusion of two exhibits from evidence. One proposed exhibit consists of minutes of the Board of Control meeting at which Stern formally was denied tenure. These minutes contain a factual statement made by Raymond Clevenger, trial counsel for the defendants in this case. Plaintiff objected that were the exhibit admitted, he would be forced to call Mr. Clevenger as a hostile

---

personally confront Shouldice or Linderoth during the counseling incident, *Givhan* is inapposite. Instead, criticizing the College and its administrators before a third party, *i.e.,* the student, is more akin to the public criticism which occurred in *Pickering.* Accordingly, we look primarily to the content of Stern's speech in determining whether first amendment protections apply. *See Givhan,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4.

witness. This would have resulted in Mr. Clevenger simultaneously being both witness and advocate. In response to this objection, the court gave Mr. Clevenger the choice of continuing as counsel and sacrificing the evidence or withdrawing as counsel, thereby saving the evidence. Since Mr. Clevenger freely chose the former option, no error occurred.

■ The second exhibit is a Canadian customs report stating that marijuana was found in the auto which the student took from the College. The court ruled the exhibit inadmissible because mention of illegal drugs might have inflamed or confused the jury. We hold that the court did not abuse its discretion in excluding this evidence.

■ Thirdly, Shouldice and Linderoth contend that having found the jury's general verdict to be inconsistent with the answer to the third interrogatory, the district court should have entered judgment on the interrogatory rather than ordering the jury to resume deliberations. This argument is without merit. The district court found that the interrogatory answers were consistent with each other. In such situations, FRCP 49 clearly empowers the trial judge to order further jury deliberations. The record reflects that the court did not suggest to the jury how to resolve the conflict. Under these circumstances, there was no error.

## V.

■ Since the district judge did not commit reversible error during trial of Stern's counseling claim, the award of nominal damages must stand. The award of back pay is, however, another matter. The general rule in this circuit is that while an assessment of back pay against a public educational institution is an equitable remedy, *Hildebrand v. Board of Trustees of Michigan State University*, 662 F.2d 439, 442 n. 8 (6th Cir.1981), a back pay award against school officials in their individual capacities is legal in nature. *Shirley v.*

*Chagrin Falls Exempted Village Schools Board of Education*, 521 F.2d 1329, 1334 (6th Cir.), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976); *see also Burt v. Board of Trustees*, 521 F.2d 1201, 1204–05 (4th Cir.1975). As a result, we consider whether the plaintiff ever requested back pay from Shouldice and Linderoth, who were sued in their individual capacities, and whether defendants agreed to submit the issue of back pay to the court.

■ A fair reading of Stern's complaint discloses that he demanded back pay only from the College.[4] While the term "back pay" appears in the prayer for relief against the College, it does not appear in the claim for compensatory and punitive damages against Shouldice and Linderoth. Actual damages were limited at trial to claims for expenses of seeking other employment, injury to professional reputation, stress, embarrassment and mental anguish. Since Stern never sought back pay from the individual defendants and since such a remedy is legal in nature, the district court erred in awarding back pay against Shouldice and Linderoth pursuant to its equitable powers.

Plaintiff contends, however, that the parties agreed to submit to the court the issue of back pay against the individual defendants. We disagree. A colloquy between the court and counsel indicates that the parties agreed to submit to the court only the question of back pay against the College, pending disposition of the eleventh amendment problem. Stern's counsel suggested the following:

So what I would propose is that the trial proceed, that the jury be allowed to determine liability in relation to the individual Defendants, and that the liability of the Defendant College be left for determination by the Court after a subsequent record can be made as to the nature of the entity with which we are dealing, and as to—so that we can deal with the question of whether or not that entity can appropriately claim Eleventh Amendment immunity.

4. The complaint's prayer for relief has never been amended. The College was ultimately

held immune from back pay liability because of the eleventh amendment.

Now in conjunction with that suggestion, I would further suggest that no question of back pay be submitted to the jury.... [I]t was my understanding that the question of back pay would be decided by the Court upon a record made subsequent to the jury's return of a verdict in relation to the individual Defendants, if indeed they found those Defendants liable. If the jury in fact finds the Plaintiff's First Amendment rights were not violated, there would be no need for this Court to entertain any future questions, I would presume. *If they find that the Plaintiff's First Amendment rights were violated, they may then assess damages in accordance with the Court's instructions in relation to the individual Defendants and I would ask the Court to subsequently entertain the question of back pay in the— and reinstatement in the context of the record that I feel needs to be made as a minimal effort to appropriately resolve the question of Eleventh Amendment immunity that was raised during this trial.*

Additionally ... to the extent that the Plaintiff's request or demand for jury is addressed in this cause to the question of reinstatement and back pay, I would hereby withdraw the request for a jury trial to that extent, and ask that on the question of a nominal, actual or compensatory, on punitive damages, as to the individual Defendants be submitted to the jury....

Indeed, *by withdrawing the back pay and reinstatement from the jury, that would allow this court upon whatever supplemental record is necessary or appropriate, to decide those issues, together with the issue of immunity, once we know the nature of the entity involved,* and that basically is the position of the Plaintiff, and the reasons we have asserted in support of that position. (Emphasis supplied.)

These comments demonstrate that plaintiff was seeking back pay solely against the College. Although the jury was to decide the damage issue in relation to Shouldice and Linderoth, the back pay question was to be considered only in the context of the College's claim to eleventh amendment immunity. The clear inference from this proposal is that a claim for back pay against the individual defendants was not in the case. In light of his subsequent actions, the trial judge must have understood otherwise. Nevertheless, this position does not comport with the theory of Stern's case as he both pleaded and presented it. We therefore hold that Stern was entitled to recover neither back pay nor pre-judgment interest on that sum.

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART. Each party shall bear its own costs on this appeal.