**Dr. Robert K. LANDRUM, Plaintiff,**

v.

**EASTERN KENTUCKY UNIVERSITY, et al., Defendants.**

**Civ. A. No. 76–101.**

United States District Court,
E.D. Kentucky,
Lexington Division.

Jan. 16, 1984.

Catherine C. Staib, Lexington, Ky., for plaintiff.

John W. Palmore and George T. Ross, Richmond, Ky., for EKU, Dr. Mullen and Board of Regents.

Mark L. Moseley, Landrum & Patterson, Lexington, Ky., for Dr. Martin, Dr. Thompson and Dr. Rowlett.

## OPINION and ORDER

BERTELSMAN, District Judge.

This matter is before the court on the motion of the defendants for summary judgment, in whole or in part. It is necessary to state the facts somewhat fully to give the reader the flavor of the situation presented.

### FACTS

This is a Civil Rights action (brought under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)) by a college teacher, Dr. Robert K. Landrum, against his former employer, Eastern Kentucky University, (hereinafter EKU), its president, Dr. Robert R. Martin, its Board of Regents and several administrators. Dr. Landrum alleges his employment relation with EKU was terminated in defiance of his First Amendment and due process rights.

Plaintiff was employed for three nine-month terms, corresponding with the academic years 1974–75, 1975–76 and 1976–77, as a professor in the College of Business. Before coming to EKU, plaintiff had taught at Kentucky State University for three years. Landrum first sought employment with EKU in November of 1973 by calling Dr. Martin, the President, who interviewed him and referred him to Dr. Rowlette, Vice-President for Academic Affairs. (Landrum Depo. at 10). Landrum had another interview in Dr. Martin's office

on February 28, 1974, during which Dr. Martin stated to Dr. Rowlette, who was also present, that Landrum would be hired as professor of management. Landrum claims that, before he left campus, the thought came to mind that he ought to discuss tenure with Dr. Martin. He says he returned to Dr. Martin's office and found Dr. Martin alone. Landrum alleges that, after he had told Dr. Martin of his three years at Kentucky State, Dr. Martin told him that if he put in two years of "satisfactory service" at EKU, he would get tenure. (*Id.* at 8).

Landrum's first year at EKU by all accounts was fairly uneventful. (Thompson Depo., 1/26/76, at 15). His conflicts with the Dean of the College of Business, Dr. Thompson, and the Chairman of the Department of Business Administration, Dr. Mullen, began in April of 1975, after he had worked during the previous semester developing a real estate program for the College of Business. He applied for and was offered its chairmanship in May of 1975. When he discovered the program was not to be operated in the manner he had recommended, however, he declined acceptance of the chair. Landrum's correspondence indicates he was opposed to having an outside expert brought in as professor of real estate. (*See* Mullen Exhibit # 38).

In the fall of 1975, the Curriculum Committee, of which Landrum was a member, had the responsibility of approving the proposed curriculum for the real estate program. The Dean of the College of Business, Dr. Thompson, communicated to Landrum his desire that the committee complete its work quickly so there would be time for the program to pass other hurdles and be in effect at the beginning of the next semester. The Committee approved the proposal, but subject to certain conditions. When the chairman of the Department of Business Administration, Dr. Mullen, called a special meeting of the committee to discuss its reservations, Landrum resigned the Committee. His letter of resignation suggests he felt pressure was being put on him to compromise his principles and rubber stamp a proposal about which he had doubts. (Mullen Exhibit # 10). Other members of the committee reported to Dr. Thompson that it had been Landrum's intention to block passage of the program. (Thompson Depo., s1/26/76, at 18).

During this same period, it was reported to Dr. Thompson that Landrum had openly criticized the way the real estate program was being run. Landrum reportedly complained that proper credit was not being given to him and to Russ Major, the realtor who had helped him get the program underway. (Thompson Depo., 1/26/76, at 16).

In December 1975, Landrum was evaluated by Dr. Mullen, who gave him high marks for his teaching and administrative skills but low marks for cooperativeness. Though Dr. Mullen discussed with the dean terminating Landrum's employment at this point, he nevertheless recommended that Landrum be rehired. (Thompson Depo., 1/6/76, at 16). In the evaluation, in noting Landrum's weaknesses, Dr. Mullen stated that Landrum was prone to withdraw his support from an endeavor when decisions were made with which he did not agree. (Mullen Ex. No. 41, Mullen Depo., 7/29/76, at 20).

Between the evaluation in December of 1975 and March of 1976, Landrum's relations with the Dean and the Department Chairman badly deteriorated. A professor who had been a friend of Landrum's reported to Dr. Mullen that Landrum was meeting with other faculty members and heavily criticizing the Dean and the running of the department. (Mullen Depo., 7/29/76, at 29–30). Landrum also distributed a description of a course he taught in management, including management of a university, and indicated department faculty and administrators would be well advised to take the course. Dr. Mullen was disturbed by this because he and other faculty perceived it as a blatant bid for the chairmanship, which Dr. Mullen had informed the department he was resigning.

(Mullen Depo., 7/29/76, at 201–203). At this same time, Dean Thompson's secretary told him that Landrum had questioned her about any evidence she had discovered of the dean's lack of competence. (Thompson Exhibit # 3).

On February 3, 1976, Landrum again resigned his membership on the Curriculum Committee, to which he had been persuaded to return. He did so in a fit of pique after the dean objected to a remark he had made during a meeting that fear of the dean prevented his taking an active role. (Landrum Affidavit of Aug. 1981).

On February 6, 1976, the dean met with Landrum and told him that he was a detriment to the organization and ought to resign. In response, Landrum wrote an 11-page letter setting out the substance of the meeting and sent copies to other faculty members. (Thompson Exhibit 30). In the letter, Landrum aired some of his grievances against the Dean and the Department Chairmen. For example, he accused the Dean of being a Hitler who frequently lies and the chairmen of using informants to keep tabs on faculty members.

That letter, according to Dr. Thompson, was the last straw. (Thompson Depo., 7/26/76, at 80). It confirmed his belief that Landrum was obstructionist, divisive, and "not a team player." (Thompson Depo., 6/7/76, at 9). Doctors Thompson and Mullen agreed that Landrum should receive a terminal contract. Because of the faculty handbook's requirement of a certain amount of lead time, Landrum was given a contract for the year 1976–77, but his employment was to terminate at its end. (Thompson Depo., 7/26/76, at 142). The contract, dated April 3, 1976, contained the notation that no new contract would be offered at its expiration.

Landrum alleges that his due process and free speech rights have been violated. His due process claim focuses on his conversation in 1974 with Dr. Martin, in which Landrum alleges he was promised tenure upon completion of two years of satisfactory performance as a professor at EKU. At the time, EKU had a formal tenure policy set by the Board of Regents, according to which faculty were "eligible for tenure only after completing a five-year probationary period of continuous service." The policy also stated, however, that upon the president's recommendation, the Board of Regents "may accept service at another institution in lieu of any part of the five-year probationary period." Plaintiff alleges Dr. Martin promised to accept his three years at Kentucky State University as a part of his five-year probation, so that he would be eligible for tenure after two years.

Plaintiff also contends that he was denied tenure by reason of the following First Amendment activities. He alleges that he was fired because of his speech in 8 different areas: (1) he turned down the real estate chair; (2) he made suggestions in a faculty curriculum meeting about the proposed real estate program; (3) he ran for a political office; (4) he criticized defendant Thompson for refusing to allow a woman to lead a prayer at a faculty meeting; (5) he wanted to teach certain materials but his superiors disapproved of them; (6) he allegedly made derogatory comments concerning his academic department's real estate program to an outsider, Realtor Russ Major; (7) he criticized defendants Dean Thompson and Department Chairman Mullen in meetings with the "lunch bunch," a group of dissident faculty members; (8) he wrote a highly critical 11-page letter dated February 7, 1976, which he circulated to defendants Thompson, Mullen, and faculty members.

## ANALYSIS

Turning initially to the First Amendment claim, we find the method of our approach dictated by the decision of the United States Court of Appeals for the Sixth Circuit in *Reichert v. Draud*, 701 F.2d 1168 (6th Cir.1983), affirming the decision of this court, published at 511 F.Supp. 679 (E.D.

Ky.1981). There, the Court of Appeals said:

"In *Hildebrand*,* this court set forth the proper approach in such cases in three steps:

"(1) The threshold question is whether the plaintiff's conduct deserves constitutional protection. 662 F.2d at 442.

"(2) If the court finds that an employee's conduct was protected by the first amendment, the finder of fact must determine whether [the action taken was] because he engaged in the protected conduct. The employee's protected conduct must be a 'substantial factor' or a 'motivating factor' in the employer's decision. 662 F.2d at 443.

"(3) Once the employee meets this burden [as outlined in 2 above] the burden is on the employer to prove that the action the employee is complaining about would have taken place absent the protected conduct. *Id.* pp. 442–43."

*Reichert*, 701 F.2d at 1170. *See also Stern v. Shouldice*, 706 F.2d 742, 747 (6th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983) (whether conduct is First Amendment activity is question of law). *See also Connick v. Myers*, —— U.S. ——, ——, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983) discussed, *infra.*

Since the issue whether or not the above-enumerated acts by plaintiff are protected First Amendment activity constitutes a question of law, the matter seems appropriate for resolution by summary judgment where, as here, there is no significant dispute concerning the facts.

This court holds that resolution of this matter is controlled by the decision of the Supreme Court of the United States in *Connick v. Myers, supra.* It should be noted that the *Stern* decision by the Sixth Circuit, *supra*, was decided just a few days before *Connick*. This court believes that the result of *Stern* would have been different in the light of *Connick*. Although the

*Connick* decision involved a public prosecutor's office, the constitutional considerations there are virtually identical to those in the case at bar.

In *Connick*, an assistant prosecutor launched a campaign of vitriolic criticism against her superiors in the prosecutor's office, raising such matters as favoritism in assignments, need for a grievance committee, level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. When the plaintiff was discharged as a troublemaker, she sued on the ground that her termination was in violation of her First Amendment rights. She relied on such previous decisions of the Supreme Court as *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

In holding that the assistant prosecutor's discharge, even if motivated by the above activities, was not in violation of her First Amendment rights, the Court said:

"*Pickering* [391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811], its antecedents and progeny, lead us to *conclude that if Myer's questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge.* When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or

---

* *Hildebrand v. Board of Trustees of Michigan State University,* 662 F.2d 439 (6th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982).

applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. (citations omitted)."

\* \* \* \* \* \*

"We hold only that when a public employee speaks *not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. *Cf. Bishop v. Wood*, 426 U.S. 341, 349–350 [96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684] (1976). Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; *this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state.*

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.

\* \* \* \* \* \*

"To presume. that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, *the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.*" (Emphasis added).

*Connick, supra,* —— U.S. at ——, —— 103 S.Ct. at 1689–1691.

The Court went on to state that, although some of the matters raised by the assistant prosecutor, such as whether or not employees felt pressured to work in political campaigns, did to some extent "touch upon a matter of public concern," dismissal of the entire action was nevertheless justified, because the profound disruption of the operations of the prosecutor's office and the disruption of close working relationships occasioned by the acid criticism outweighed First Amendment considerations.

This court recognizes that there must be more room for divergent views in a university situation than in a prosecutor's office, and that frequently the working relationship between a university and members of the faculty is not as close as that which existed in *Connick*. Nevertheless, the extensive period over which the verbal assaults by the plaintiff here were leveled at the university administration, and the intense hostility he displayed toward the administration, such as fomenting a hostile faction (the lunch bunch), more than counter-balance this factor.

 Even where some of the expression in issue *may* involve matters of public concern, the *Connick* opinion makes clear that a balancing process is required between First Amendment interests and the right of the government as employer to conduct its affairs without constant disruptions due to factionalism and the machinations of troublemakers. Fulfilling its duty to rule on the First Amendment issue in this case as a matter of law, this court must, in the performance of the required balancing process, conclude that none of the plaintiff's activities were protected by the First Amendment. The balance tips against plaintiff, even though some of his criticisms of the administration may have been tangentially related to such matters of legitimate public concern as sex discrimination.

Considering all the circumstances plaintiff's activities must be characterized as

dealing "with individual disputes and grievances" which "would be of no relevance to the public's evaluation of the performance of governmental agencies." *McKinley v. City of Elay,* 705 F.2d 1110, 1114 (9th Cir.1983). Partial summary judgment must, therefore, be granted to the defendants on the First Amendment claim. *See* F.R.Civ.P. 56(d).

Plaintiffs rely heavily on such cases as *Perry v. Sindermann; Mt. Healthy City Board of Ed. v. Doyle;* and *Givhan v. Western Line Consolidated School District,* cited *supra.* This court must admit that it is difficult to reconcile all these cases, particularly the liberal interpretation given to First Amendment protection of employee criticism in *Givhan* and *Mt. Healthy.* The letter found a controversy over a teacher dress code to be constitutionally protected; the former similarly protected statements made in the privacy of a school principal's office.

In frankness, the court must state that it reads *Connick* as deliberately intended to narrow the scope of these decisions, even though they were not expressly overruled. A careful study of all these decisions leads to the inevitable conclusion that the First Amendment in the employment context is now to be more narrowly interpreted to give greater scope to the legitimate rights of governmental entities as employers, and also to reduce the burdens on the courts caused by the burgeoning of litigation initiated by the decisions upon which plaintiff relies here. The Supreme Court in *Connick* had in mind such considerations as those alluded to by this court in *Reichert v. Draud,* 511 F.Supp. at 685–6:

"The cost to the school system of defending the instant action must have exceeded $10,000 at a conservative estimate, not counting the cost of the administrators and teachers being absent from school, and other indirect costs. The primary task of administrators and teachers is to teach, not spend their time in court. Conscientious administrators, teachers, and board members can be deterred from public service by the threat of lawsuits.... Further, the concept of 'chilling effect' can cut two ways, since effective decisionmaking can easily be inhibited if suits can be too freely brought by disgruntled employees."

The court concludes that the decision of the Sixth Circuit in *Stern v. Shouldice, supra,* would have been different under *Connick,* and that the decision of this court and the Sixth Circuit in *Reichert v. Draud,* although reaching the same result, could as well have been based on the doctrine of *Connick.* The court finds *Mahaffey v. Kansas Board of Regents, et al.,* 562 F.Supp. 887 (D.Kan.), in point and agrees with the views expressed therein.

■ Although the court has concluded that the motion for summary judgment of the defendants on First Amendment grounds must be granted, the court also concludes that an issue of fact is presented with regard to the due process issue, in that the depositions and other factual materials currently in the record indicate a sufficient issue of material fact to preclude this court from holding as a matter of law that there was no expectation of continued employment on the part of the plaintiff. *See Vail v. Board of Education of Paris Union School District No. 95,* 706 F.2d 1435 (7th Cir.), *cert. granted,* —— U.S. ——, 104 S.Ct. 66, 78 L.Ed.2d 81 (1983). The case will stand for trial as scheduled on the due process issue only.

IT IS SO ORDERED.