Bruce **MESSER** and Timothy P'Simer, Plaintiffs,

v.

Fran **CURCI**, Kelly Newton, W. Gayle Foust and Thomas Lykins, Defendants.

Civ. A. No. 84–157.

United States District Court, E.D. Kentucky, Catlettsburg Division.

June 4, 1985.

Stephen Krumm and Deborah G. Roher of Northeast Ky. Legal Services, Ashland, Ky., for plaintiffs.

J. Patrick Abell, Dept. of Parks, Paul C. Gaines, III, and Daniel F. Egbers, Cabinet for Human Resources, Frankfort, Ky., for defendants.

## OPINION AND ORDER

BERTELSMAN, District Judge.

"To the Victor Belong the Spoils of the Enemy."—William L. Marcy, 1832

Defendants' motion to dismiss in this action presents the court with a significant issue, namely, whether the rule of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), prohibiting *firings* of non-policy making public employees for reasons of political patronage, applies to *hirings* of such employees. Considering the age of the *Elrod* decision and the long standing practice of making such personnel decisions on the basis of patronage, there is remarkably little authority on this issue. Perhaps this is due to the fact that frequently the issue is not clearly presented factually. That is not the situation with regard to the present case, however, where the motion to dismiss now before the court presents the precise issue for decision.

### FACTS

In this 42 U.S.C. § 1983 action, plaintiffs Bruce Messer and Timothy P'Simer challenge the decision of the Kentucky Department of Parks not to rehire them as seasonal maintenance workers at the Carter Caves State Resort Park in Carter County, Kentucky. They base this action on the allegation that defendants acted in concert not to rehire the plaintiffs because of their political beliefs and because of their failure to work in the 1983 election campaign of Martha Layne Collins. Ms. Collins was elected Governor of the Commonwealth in that election.

There are four defendants in this action. First, Fran Curci is the Commissioner of the Department of Parks. His duties include the formulation and implementation of hiring policies and practices within his department. Second, W. Gayle Faust is the Department of Parks Director of Personnel. His duties include the employment and termination of employees within the Department. Third, Kelly Newton is the Superintendent of Carter Caves State Park. His duties include the determination of employment status at the Park. Last, Thomas Lykins is a member of the Carter County Democratic Party Committee who allegedly received and reviewed applications for seasonal employment at the Park during the 1984 season and was permitted to make actual hiring decisions during this period. Plaintiffs allege that the defendants held their respective positions at the time of the alleged deprivations.

On this motion, the following facts must be taken as true. Plaintiffs Messer and P'Simer were continuously employed as seasonal maintenance workers at the Park for the past eight and three years, respec-

tively. Their positions commenced in mid-March and terminated in mid-November.

They filed their applications for seasonal maintenance positions at the park in January of 1984 for the 1984 summer season. Annual re-application for seasonal employment had been defendants' hiring practice and had been utilized each of the preceding years plaintiffs had been employed at the park. These applications were delivered to Newton at the park.

Plaintiff Messer made a follow-up inquiry concerning the status of his application in March of 1984. He contacted Newton, who told Messer that he had recommended both plaintiffs be rehired and that he had taken the applications to defendant Lykins' office. Newton claimed that the Committee of which Lykins was a member did not permit him to have any voice over who was ultimately hired.

Immediately thereafter, Messer went to Lykins' home to inquire about his application's status. He was told by Lykins that no one would be hired for seasonal employment at the park except through the Committee and that this Committee would not hire anyone who had not worked for the Martha Layne Collins election effort. Messer's belief that he was not to be rehired was confirmed on or about April 7, 1984, when he went to the park and saw two new individuals performing the duties which had been performed by the plaintiffs in previous years.

Plaintiff P'Simer conversed with Messer, who notified him of the previous conversation he had with Newton and Lykins. P'Simer went to Lykins' home on or about May 1, 1984 to ascertain why he had not been rehired for the 1984 season. Lykins indicated he had not been rehired because he had not worked in Martha Layne Collins' campaign.

Messer is a registered Republican and P'Simer is not a registered voter. Neither Messer nor P'Simer worked in the 1983 campaign of Martha Layne Collins. Plaintiffs allege that they have been deprived of employment as seasonal maintenance workers at the park due to their political beliefs and associations in contravention of their rights under the First and Fourteenth Amendments to the Constitution of the United States.

## ISSUES

1. Pursuant to Kentucky law with respect to state personnel management, is the situation described above in plaintiffs' complaint one of a "failure to rehire" or "initial hiring"?

2. Is it a violation of the First and Fourteenth Amendments to refuse to hire a person for public employment in a non-policy making position for reasons of political patronage?

## ANALYSIS

*This is a Failure to Hire Case.*

■ Under the relevant Kentucky statutes, the court concludes plaintiffs were initial applicants for the seasonal positions as maintenance workers at the park for the 1984 season. KRS 18A.005(20) provides:

"A 'temporary position' is one created for a defined period of time not to exceed six (6) months and not renewable; a 'temporary employee' is one (1) appointed to such a temporary position. A 'seasonal position' although temporary in duration in the foregoing sense coincides in duration with a particular season or seasons of the year, but may not exceed eleven (11) months duration, and may recur regularly from year to year; a 'seasonal employee' is one appointed to such a seasonal position from an existing eligible list or without reference to an eligible list."

Pursuant to the express terms in the statute, plaintiffs' old seasonal positions could not legally exceed eleven months in duration. At the end of the 1983 season, plaintiffs' employment relationship with the state was terminated on criteria other than political affiliation. Plaintiffs stand in the same position as any other seasonal applicants with respect to any prospective seasonal employment in the 1984 hiring

year. Notwithstanding plaintiffs' past employment as seasonal maintenance employees and their expectation of continued employment prior to the beginning of the 1984 season, the court concludes that their status was as applicants for employment with the state and they stood in the same position as any other job applicant for seasonal employment.

■ Plaintiffs argue vigorously that the adverse personnel action should be characterized as a dismissal rather than a refusal to hire. This determination makes a critical difference as will be seen from the subsequent analysis in this opinion. In analyzing their status as employees, the court must defer to state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Kendall v. Board of Education,* 627 F.2d 1, 4 (6th Cir.1980); *Yashon v. Gregory,* 737 F.2d 547, 553 (6th Cir.1984).

The statute quoted above is clear on its face that after each period of temporary or seasonal employment the plaintiffs reverted to non-employment status. Their expectation of being re-employed could not rise to a property right in the face of the plain language of the statute.

Therefore, plaintiffs' claim must be analyzed as a refusal to *hire* for political patronage reasons, rather than as a *dismissal* for such reasons.

*Refusals to Hire for Reasons of Political Patronage.*

Tradition has it that it was Andrew Jackson, upon his election as President of the United States, who cloaked the practice of political patronage in hirings of public employees with the mantle of respectability.

Ever since, "Old Hickory's" approach has certainly been a time-honored albeit cynical practice of governments at all levels, but particularly in local government. As is well known, it has been ameliorated to some extent by the salutary development of the institution of civil service.

Until 1976, public employees who were not under civil service were more or less at the mercy of the politicians in both obtaining and retaining employment. However, in that year, the Supreme Court decided the landmark case of *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

In *Elrod* it was held that the *discharge* of non-policymaking employees purely because they were not of the party or political philosophy of a newly elected administration was violative of their First Amendment rights. *Elrod* must be carefully read for a proper evaluation of its precedential effect, however.

The problem in interpreting *Elrod* arises from the fact that there was no opinion of the Court. The plurality opinion is wide-sweeping in its discussion of First Amendment rights. It contains sweeping denunciations of the entire patronage system, and its language is broad enough to condemn political patronage as a basis of personnel decisions whether they involve initial hirings or discharges. However, only three judges joined in this plurality opinion.

Justices Stewart and Blackmun concurred in a much narrower opinion. In the concurring opinion, to which the holding of the court is limited, it was specifically stated

"This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations. In particular, it does not require us to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party, and I would intimate no views whatever on that question." 427 U.S. at 374, 96 S.Ct. at 2690.

The dissent is also enlightening in interpreting the sweep of *Elrod.* There, the dissenting Justices did not so much disagree with the importance placed on the First Amendment by the plurality, but emphasized the interference with state government that would be caused by the federal court's acting to prohibit personnel

decisions of state and local government based upon political patronage. Thus, in his dissent, Chief Justice Burger stated:

"In my view, the issue is not so much whether the patronage system is 'good' or 'bad,' as the plurality characterizes the problem, but whether the choice of its use in the management of the very government of each State was not, in the words of the Tenth Amendment, 'reserved to the States ... or to the people.'" 427 U.S. at 376, 96 S.Ct. at 2691.

In a separate dissent, Justice Powell pointed out that some benefits were to be derived from the patronage system as far as encouraging political activity and strengthening political parties. 427 U.S. at 382, 96 S.Ct. at 2693. The epitome of Justice Powell's dissent is found in the following language.

"I thus conclude that patronage hiring practices sufficiently serve important state interests, including some interests sought to be advanced by the First Amendment, to justify a tolerable intrusion on the First Amendment interests of employees or potential employees." 427 U.S. at 387, 96 S.Ct. at 2696.

It is clear, then, that five Justices[1] at the time of the decision in *Elrod* would not have extended the prohibition on political *firings* to political *hirings*.

All the Justices approached the issue as a problem of balancing between the First Amendment rights of the employees and the right of state and local governments to continue practices and institutions that had existed for at least 200 years without interference by the federal courts.[2]

Nothing that has occurred since the *Elrod* decision indicates that the Supreme Court, or indeed the majority of other courts, would extend the First Amendment prohibition against political firings of non-policymaking employees to political hirings, such as that involved in the case at bar. Indeed, upon reflection, it appears that the balancing process indicated above would militate against such an extension.

Looking first at the First Amendment rights of the employees, it appears that a person who has already been hired and is holding a public post would indeed be intimidated in the exercise of his or her First Amendment rights if he stood to lose by reason of the expression or exercise of his political beliefs a post already obtained, which was now the basis of his livelihood. There would be a much less "chilling effect" on persons who merely had an expectation of public employment.

Turning to the factor of interference with state and local government, it may be seen that the interference would be much greater if the rule were extended to prospective employees as opposed to persons already employed. There can be only one incumbent of a job who is discharged and is in the position to bring suit against the state or local government. There might be a host of applicants for every job, who would sue upon its being filled by another and claim that they would have been hired but for their political beliefs. Such motives are not always easy to discern and are seldom as openly stated as they were in the case at bar. Thus, applying the *Elrod* decision to *hiring* would be likely to involve local government officials in numerous lengthy trials concerning the merits of disappointed job seekers. This would impose burdens on local government that were unacceptable to the majority of the Justices in *Elrod*.

One of the few decisions on this issue is that by my colleague and neighbor, Judge Rubin of the Southern District of Ohio at Cincinnati, in *Avery v. Jennings,* 604

**1.** One Justice did not participate in the decision.

**2.** Thus, Justice Powell in concluding his dissent observed: "The judgment today unnecessarily constitutionalizes another element of American life—an element certainly not without its faults but one which generations have accepted on balance as having merit. We should have heeded, instead, the admonition of Mr. Justice Holmes that '[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it....'" 427 U.S. at 389, 96 S.Ct. at 2697.

F.Supp. 1356 (S.D.Ohio 1985).[3]  Judge Rubin in a two-pronged opinion held that an applicant for public employment had not established as a matter of fact that a refusal to hire her was based on political motives.  But the opinion went further to hold that even if she had, she would not be entitled to redress under the Constitution of the United States.  I agree entirely with Judge Rubin's analysis of this latter issue.  In concluding his analysis, Judge Rubin succinctly observes:

> "To recognize the plaintiff's claim that the defendants' failure to hire her, allegedly on the basis of her political affiliation, was an encroachment on her first amendment rights under the line of cases discussed above would require, therefore, a broad and unwarranted extension of those cases beyond their facts and precedential effect....  Absent any persuasive arguments in favor of extending the applicability of *Elrod* and *Branti* [4] to cases involving employment decisions other than discharges, this Court declines to do so."  604 F.Supp. at 1362.

This court reaches the same conclusion.  That the patronage system has its evils cannot be denied.  The plaintiffs were perhaps better able to perform the jobs they sought than those who were allegedly hired for patronage reasons.  Yet, to attempt to recognize and enforce their rights, and those of other applicants for public employment, would involve the federal courts in a myriad of personnel decisions at state and local level that would contravene the spirit of the Tenth Amendment.  As stated above, a plethora of lawsuits by swarms of disappointed job seekers would be the inevitable result of recognition of the cause of action asserted by plaintiffs.  Neither in *Elrod* nor in any subsequent decision has the Supreme Court indicated any disposition to go so far.  In fact, its tendency has been to restrict the scope of First Amendment litigation of public employees.  *See, e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), discussed in *Landrum v. Eastern Kentucky University,* 578 F.Supp. 241 (E.D.Ky.1984).  In *Landrum,* this court observed:

> "... the First Amendment in the employment context is now to be more narrowly interpreted to give greater scope to the legitimate rights of governmental entities as employers, and also to reduce the burdens on the courts caused by the burgeoning of litigation initiated by the decisions upon which plaintiff relies here."  578 F.Supp. at 247.

In effect, the plaintiffs ask this court to mandate a merit system for all state and local public employees.  Whatever the court's personal views of patronage hiring, there exists no authority persuasive to this court for judicial activism of that sort.[5]

Therefore, the motion to dismiss must be *granted.*  A separate judgment is this day entered dismissing the complaint.

---

3.  Reference is made to *Avery* for an excellent discussion of the development of First Amendment law concerning public employment.  604 F.Supp. at 1360–61.  *See also, Note, First Amendment Limitations on Patronage Employment Practices,* 49 U.Chi.L.Rev. 181 (1982).

4.  *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

5.  Plaintiffs' position does find support in *Shakman v. Democratic Organization of Cook County,* 435 F.2d 267 (7th Cir.1970), *cert. denied* 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971), a pre-Elrod case, implemented in 569 F.Supp. 177 (N.D.Ill.1983), and *Delong v. United States,* 621 F.2d 618 (4th Cir.1980).  But this court believes that these decisions are outweighed by the more recent cases discussed above, especially *Connick v. Myers, supra.*  Other recent cases recognizing a more restrained approach to First Amendment restrictions on the employment practices of state and local government are:  *LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983) (political consideration in awarding public contracts); *Fox & Company v. Schoemehl,* 519 F.Supp. 849 (E.D.Mo.1981) (independent contractor accountants).