William BLAMEUSER,
Plaintiff–Appellant,

v.

Colonel Donald ANDREWS, United
States Army, Defendant–Appellee.

No. 79–1992.

United States Court of Appeals,
Seventh Circuit.

Submitted Aug. 27, 1980.*

Decided Sept. 22, 1980.

* After the preliminary examination of the briefs, the court notified the parties that it had tentatively decided that oral argument was unnecessary. The notice provided that any party could file a "Statement as to Need of Oral Argument." *See* Fed.R.App.P. 34(a); Circuit Rule 14(f). The appellant filed such a statement. Upon consideration of that statement, the briefs, and the record, the appeal is submitted for decision without oral argument.

William Blameuser, pro se.

Joan F. Kessler, U.S. Atty., Lawrence O. Anderson, Asst. U.S. Atty., · Milwaukee, Wis., for defendant–appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.

PELL, Circuit Judge.

The plaintiff–appellant, William Blameuser, challenges the district court's grant of summary judgment in favor of the defendant, Colonel Donald Andrews. The plaintiff was, at the time he commenced this action, a student at St. Norbert College.[1] The defendant, a professor of military science, is in charge of the Army Reserve Officers' Training Corps (ROTC) program at the college. The plaintiff's complaint alleges that the defendant impermissibly considered the plaintiff's political and social beliefs in denying him admission to the ROTC's advanced course. Specifically, the plaintiff argues that he was illegally discriminated against because of his views on white supremacy and his Nazi sympathies. The district court held that the defendant demonstrated a compelling state interest for considering the plaintiff's beliefs and that those beliefs warranted denying the plaintiff admission to the program. *Blameuser v. Andrews*, 473 F.Supp. 767 (E.D. Wis. 1979).

The facts are to a large extent uncontested. The objective of the Army's senior ROTC program is to attract and prepare selected students, who are paid a monthly

[1]. The plaintiff has since graduated from St. Norbert. The government, however, has not suggested that the case is moot and because the plaintiff still seeks, among other relief, "back pay" it is apparent that the controversy remains both real and alive.

stipend, to serve as commissioned officers in the Regular Army or the U.S. Army Reserve. The program is a major source of newly commissioned officers in the Army and includes young men and women from all economic and social strata of our society. The ROTC program is divided into two courses of study. The basic course is normally pursued by a cadet during the freshman and sophomore years of college. Subject to certain requirements, generally all students at a participating college or university are eligible for enrollment. Indeed, the plaintiff here has already enrolled in and completed the basic course. The advanced course is normally pursued in a cadet's junior and senior years. The advanced course includes advanced camp—a six week training period conducted at a military installation, usually between a cadet's junior and senior years. Admission to the advanced course is subject to several requirements including the cadet's possession of "officer potential." Army Regulation 145–1, ¶ 3–17. The defendant Andrews, as a professor of military science, is charged with recruiting the "best qualified" students in the basic course for enrollment in the advanced course. *Id.* ¶ 2–36.

The plaintiff is a self–proclaimed member of the National Socialist Party of America (NSPA).[2] He has publicly professed his belief in white supremacy—a doctrine which he regards as justifying the exclusion of all black and Jewish people from American society. In an application for an ROTC scholarship, he stated:

> Should the United States become involved in an anti–communist war I would immediately go into the army and apply for action oversees [sic]. I would not, however, volunteer to fight on the side of the Isaelis or of Negro communists in Africa.

Nevertheless, he professes his "loyalty . . . to the U.S. Constitution and The *Republic* for which It Stands," and has executed the loyalty oath required for enrollment in all ROTC courses.

2. In his brief in this court, the plaintiff now refers to his former membership in the NSPA.

In a letter to the plaintiff dated October 24, 1978, the defendant stated the reasons for the denial of the plaintiff's application to enroll in the advanced course. The letter stated that a variety of considerations were taken into account and "no single factor . . . prompted this decision." The letter acknowledged, however, that

> your publicly stated personal beliefs which appeared in an issue of the *St. Norbert Times* was the major factor. These beliefs are inconsistent with the policies of the Army, and it would be your duty to uphold and support these policies if you were to become an Army officer. It is highly improbable that you could successfully accomplish this task.

The newspaper article adverted to is an interview of the plaintiff in which he explained his beliefs and the tenets and goals of the NSPA. Among the sentiments expressed by the plaintiff are the following:

> We are against any mixing of the races. By the white races I mean all white Europeans of non–Jewish descent.

> Q: . . . . If you gained control of the government what would you do with Black and Jewish peoples?

> Blameuser: That's a good question. Since it has been pretty well proven that segregation within a society does not work, the best thing that I could think of would be to deport, or repatriate these people to, let's say Africa. That would mean that I'd have to take over a country there to ship these Negroes over.

> Q: You would have to take over a country there?

> Blameuser: Yes, unless the ones already there would accept them.

> Q: What if they didn't want to go?

> Blameuser: Any who did not go would become rigidly segregated, noncitizens. So that implies they will not be forced to go, but would be confined to special areas.

> Q: You would take away their rights as American citizens?

He has not, however, disavowed his belief in white supremacy.

Blameuser: That is right. They would not be considered American citizens.

Q: Do you agree with this?

Blameuser: Yes!

. . . . .

Q: Well what about the eastern races? Are they inferior too?

Blameuser: We would not allow these races to mix with the whites, but the Orientals would be allowed to stay since they have proven to be civilized.

. . . . .

Blameuser: . . . I am not saying they are not human. What I am saying is that the Blacks are obviously further behind the whites on the evolutionary scale. I'd say they are a hundred or two hundred thousand years behind the white race.

. . . . .

Blameuser: I would like to make a closing remark, and that is "At the end stands victory." This was a Nazi slogan from W.W.II. You see I believe that in the final analysis the N.S.P. will take over America and possibly the whole world.

The record also indicates that the defendant considered evidence showing that the plaintiff had been observed wearing clothing similar to that of a Nazi stormtrooper and had distributed Nazi publications such as a "comic" strip entitled "Aryan" which advocates boycotting "Jew Stores" and concludes with a character resembling Uncle Sam stating "There is only one meaningful political alternative to Jewish capitalism or Jewish communism—that is National Socialism! Learn the facts—Stop the Jewish Parasites—Help Build a Strong White America." Viewed in the light most favorable to the plaintiff, as the record must be on the defendant's motion for summary judgment, it is fair to say that the plaintiff was denied enrollment in the advanced course primarily because of his Nazi sympathies and his belief in white supremacy.[3]

◼ The district court concluded that the plaintiff's complaint presented a justiciable controversy within the court's jurisdiction to decide. Although the defendant does not concede the justiciability of this case, he does not devote any argument to the issue in his brief in this court. We believe the district court correctly assumed jurisdiction over the case. Although the courts are reluctant to intervene in military matters, the specific protections of the Bill of Rights are applicable with respect to the military. The plaintiff here places at issue " 'one of the liberties' the Supreme Court has declared to be long recognized as protected by the Constitution." *Crawford v. Cushman*, 531 F.2d 1114, 1121 (2d Cir. 1976). *Cf. Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 595, 62 L.Ed.2d 540 (1980) (reviewing Air Force regulations prohibiting petitioning on base without prior approval of base commander). Moreover, this is not a case where the plaintiff seeks wide-ranging relief beyond the judiciary's jurisdiction to

3. The Government's brief suggests that the plaintiff's political and social beliefs aside, other factors were considered which established that the plaintiff was unqualified for the advanced course. The record does show that other factors were considered, but when viewed in the light most favorable to the plaintiff, the record indicates that the plaintiff's beliefs were decisive. The record, for example, contains a memorandum signed by Colonel Andrews which discusses the plaintiff's qualifications and concludes:

When regarding qualification for the Advanced Course, one might readily surmise that Cadet Blameuser could be fairly judged as unqualified by virtue of lack of aptitude and leadership potential. . . . Viewed by himself, this evaluation is generally true, but presents a dilemma. What is fair when he is viewed as an individual with deficient qualifications, may not be as fair when he is compared with others. Many detachments, including that at St. Norbert College, are still rebounding from the Vietnam era sag in enrollments. To small institutions such as St. Norbert College, the attainment of *quantity* enrollment requirements has turned the corner only this year. At this point, quantity requirements still militate against quality constraints. Consequently, there is no precedent upon which to deny enrollment into the Advanced Course when otherwise qualified. Thus, it is fair to say that the record does not exclude the possibility that but for the plaintiff's views he would have been admitted to the advanced course.

grant. *Compare Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). The case is justiciable, and we therefore proceed to the merits of the plaintiff's First Amendment claim.

 The plaintiff's personal beliefs, although abhorrent to democratic principles, are political in nature and thus fall within the core of the interests which the First Amendment's guarantee of free speech was intended to protect. The plaintiff is, of course, free to hold those views, to associate with those who share them, and indeed to seek to persuade others to adopt them. *See Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264. But this is not a case where the Government is attempting to suppress the plaintiff's ideas or to punish him for expressing them.

Instead, the Government has withheld a benefit from the plaintiff because of his political convictions. Although the old right–privilege doctrine has been abandoned, *see Elrod v. Burns*, 427 U.S. 347, 360–61, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976) (opinion of Brennan, J.) and cases cited therein, the courts have recognized that when the benefit at issue is in the form of the establishment or continuation of an employment relationship, substantial Government interests may justify burdens on political speech and association which otherwise could not withstand the exacting scrutiny given to governmental conduct affecting fundamental rights. *See, e. g., United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973) ("the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.' "); *Goldwasser v. Brown*, 417 F.2d 1169 (D.C. Cir. 1969).[4] Here, enrollment in the ROTC advanced course is similar in many respects to the establishment of an employment relationship. An entrant into the program looks forward to a commission as an officer in the services and is rewarded by a monthly stipend. Denial of enrollment, however, does not deprive a student of the educational opportunity to attend military science courses, because one denied enrollment may nevertheless take the course as an auditing student.[5] Because of the similarity between the ROTC program with the employment situation, certain burdens on First Amendment interests may be tolerated which otherwise would be impermissible.

 The public office to which the plaintiff aspires, a commission as an officer in the armed services, is a sensitive one. As an officer in the military, the plaintiff would be required to accept certain limitations on First Amendment rights he would enjoy as a civilian.

The military is, "by necessity, a specialized society separate from civilian society."

---

4. Analogous are those decisions concerning patronage firings. *See, e. g., Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). Although the Supreme Court has found that the firing of public employees because of their political affiliations to be generally offensive to the First Amendment, it has taken care not to create a *per se* rule. *See id.* at 1294 ("the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved").

5. Auditing students are afforded the same educational opportunities as enrolled ROTC cadets except that they are ineligible for subsistence allowances, the ROTC scholarship program, and the ROTC flight instruction program, and may not participate in drill or wear a uniform. Auditing students are not eligible for appointment as commissioned officers. *See* Army Regulation, 145–1, ' 3–21, ' 3–24. In this case, the plaintiff has apparently been permitted to participate in the advanced military science classes as an auditing student and has received academic credit for his participation.

*Parker v. Levy*, 417 U.S. 733, 743 [94 S.Ct. 2547, 2555, 41 L.Ed.2d 439] (1974). Military personnel must be ready to perform their duty whenever the occasion arises. *Ibid.* To ensure that they always are capable of performing their mission promptly and reliably, the military services "must insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger v. Councilman*, 420 U.S. 738, 757 [95 S.Ct. 1300, 1313, 43 L.Ed.2d 591] (1975); see *Department of the Air Force v. Rose*, 425 U.S. 352, 367–368 [96 S.Ct. 1592, 1602, 48 L.Ed.2d 11] (1976).

" 'Speech that is protected in the civil population may . . . undermine the effectiveness of response to command.' " *Parker v. Levy, supra* [417 U.S.], at 759 [94 S.Ct. 2563], quoting *United States v. Priest*, 21 U.S.C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972). Thus, while members of the military services are entitled to the protections of the First Amendment, "the different character of the military community and the military mission requires a different application of those protections." *Parker v. Levy, supra* [417 U.S.], at 758 [94 S.Ct., at 2563]. The rights of military men must yield somewhat " 'to meet certain overriding demands of discipline and duty . . . .' " *Id.*, at 744 [94 S.Ct., at 2556,] quoting *Burns v. Wilson*, 346 U.S. 137, 140 [73 S.Ct. 1045, 1047, 97 L.Ed. 1508] (1953) (plurality opinion). Speech likely to interfere with these vital prerequisites for military effectiveness therefore can be excluded from a military base. *Spock*, 424 U.S. 828, at 840 [96 S.Ct. 1211, at 1218, 47 L.Ed.2d 505]; *id.*, at 841 [96 S.Ct., at 1219] (Burger, C.J., concurring); *id.*, at 848 (Powell, J., concurring).

*Brown v. Glines*, 444 U.S. 348, 354–55, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980). Moreover, it must be

> recognized that a military officer holds a particular position of responsibility and command in the Armed Forces:
>
> "The President's commission . . . recites that 'reposing special trust and confidence in the patriotism, valor, fideli-

ty and abilities' of the appointee he is named to the specified rank during the pleasure of the President."

*Parker v. Levy*, 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974) *quoting Orloff v. Willoughby*, 345 U.S. 83, 91, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953). The interest of our government in recruiting qualified candidates to be officers in the armed services is a compelling one which may justify some inquiry into and consideration of an applicant's political beliefs to determine whether the candidate is deserving of that "special trust and confidence." It cannot be said that the defendant's consideration of the plaintiff's political views by itself violated the plaintiff's rights.

■ The next question, then, is whether the defendant was justified in determining that the plaintiff's particular political and social beliefs disqualified him from enrollment in the ROTC advanced course. The defendant is charged with recruiting the best qualified among the applicants–a discretionary judgment with which the courts must must be reluctant to interfere. Nevertheless, because of the importance of the rights at stake, we believe that some review is necessary. Whatever the appropriate standard of review, we hold that the defendant's decision was fully justified.

An officer in the service, like all military personnel, must exhibit discipline and the willingness to follow commands. The plaintiff's statements about his unwillingness to volunteer in the event of military conflict in the Middle East or Africa raise legitimate doubts about the plaintiff's possession of those necessary qualities. His views on race relations further draw into question his ability to obey commands, especially in a situation in which he regards his military superior as socially inferior.

■ These doubts about the plaintiff's ability to accept commands aside, his convictions about the supremacy of the white race negate any possibility of his effective leadership in the military. Army Regulation 145–1, ¶ 3–17 requires that applicants for the advanced course possess "leadership

potential." Beliefs and goals such as those held by the plaintiff "are repugnant to the core values held generally by residents of this country, and indeed, to much of what we cherish in civilization." *Collin v. Smith*, 578 F.2d 1197, 1200 (7th Cir. 1978), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264. As the district court noted:

> Those persons selected as officers in the military will necessarily be responsible for leading . . . persons of various races and religions. Thus, among the qualifications which a candidate for military officer must demonstrate is the ability to lead and effectively gain the respect of persons from diverse backgrounds.

473 F.Supp. at 769. We believe it is evident that the plaintiff lacks those qualifications.

This case falls within that very narrow class of cases where a citizen's admittedly protected beliefs are demonstrably incompatible with the important public office he seeks and inimical to the vital mission of the agency he would serve. *See* L. Tribe, American Constitutional Law § 12–23 at 706 (1978); *cf. Augustus v. School Board of Escambia County*, 507 F.2d 152 (5th Cir. 1975) (enjoining use of confederate battle flag as a school symbol and use of the name "Rebels' in connection with extracurricular activities on the ground that exercise of the right would cause violence and disrupt the educational process). We conclude, as did the district court, that the consideration of the plaintiff's political beliefs served the government's compelling interest in ensuring the recruitment of qualified officers in the military, and, furthermore, that the denial of his application was justified because those beliefs would have prevented the effective performance of the office involved. The judgment of the district court is affirmed.