**Paul A. LaFALCE, Plaintiff-Appellant,**

v.

**Michael HOUSTON and City of Springfield, Illinois, Defendants-Appellees.**

No. 82–3035.

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1983.

Decided July 14, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 9, 1983.

Mary Lee Leahy, Leahy & Leahy, Springfield, Ill., for plaintiff-appellant.

Robert M. Rogers, Office of Corp. Counsel, City of Springfield, Springfield, Ill., for defendants-appellees.

Before CUDAHY and POSNER, Circuit Judges, and ROSENN, Senior Circuit Judge.*

POSNER, Circuit Judge.

We are asked to hold that the First Amendment, as applied to the states through the due process clause of the Fourteenth Amendment, forbids a city to use political criteria in awarding public contracts. The complaint, which was brought under 42 U.S.C. § 1983 and dismissed below on the defendants' Rule 12(b)(6) motion, alleges that the plaintiff submitted a bid to the City of Springfield, Illinois, on behalf of his business, Signs for Progress, to install and maintain benches along city streets; that "of all bids submitted Plaintiff's bid was the most favorable to the City"; but that nevertheless the defendant Mayor caused the city to "award the contract to another bidder, Ace Sign Company, because the operators of Ace Sign Company were political supporters of Defendant [Mayor] while Plaintiff was not." The complaint asks for actual and punitive damages amounting to $750,000.

■ In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court held that the discharge of a nonpolicymaking public employee solely because of his political beliefs violates the First Amendment. The basis of these holdings is that public employees would be discouraged from expressing their true political views if it might cost them their jobs. Retribution short of discharge is actionable on the same principle. *Delong v. United States,* 621 F.2d 618, 623–24 (4th Cir.1980); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). The plaintiff in this case argues that contractors will similarly be discouraged from expressing their true political beliefs if the result of doing so may be the loss of public contracts; they will have an incentive, regardless of their beliefs, to support, financially and in other ways, incumbents or likely winners. The argument has an appealing symmetry but has been rejected in the only two reported cases, both from the Eighth Circuit, to consider it. *Sweeney v. Bond,* 669 F.2d 542, 545 (8th Cir.1982); *Fox & Co. v. Schoemehl,* 671 F.2d 303 (8th Cir. 1982).

■ The practice of favoring political supporters in awarding contracts for public projects has a long history at the federal and particularly state and local levels. See, e.g., Caro, The Power Brokers: Robert Moses and the Fall of New York 713–14, 723–24, 738–39, 799 (1974); Heard, The Costs of Democracy 144 (1960). That it could interfere with the free expression of political views whether directly or through its effect on campaign contributions, cf. *Buckley v. Valeo,* 424 U.S. 1, 14–23, 96 S.Ct. 612, 632–636, 46 L.Ed.2d 659 (1976) (per curiam), is hardly open to question. But before we can

---

* Hon. Max Rosenn of the Third Circuit, sitting by designation.

decide whether the practice is therefore unconstitutional, we must consider both the extent of the likely interference and the consequences of trying to prevent it through an interpretation of the Constitution.

Although some business firms sell just to government, most government contractors also have private customers. If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent and the state does not have laws requiring the award of the contract to the low bidder (or the laws are not enforced), it is not the end of the world for him; there are other government entities to bid to, and private ones as well. It is not like losing your job. Of course, the contrast can be overstated; unless the government worker who loses his job cannot find another job anywhere, the loss will not be a total catastrophe. Nevertheless, many government workers could not find employment at the same wage in the private sector; and the prospect that a protracted period of search following discharge might well result in a substantially less well paid job would cause many government workers to flinch from taking political stands adverse to their superiors. An independent contractor would tend we imagine to feel a somewhat lesser sense of dependency.

There is also a question how politically independent most business firms would be even apart from such pressures as the award of public contracts on political grounds may exert on them. Many firms that have extensive government business are political hermaphrodites. They support both major parties (see, e.g., Heard, *supra*, at 145), and not only or mainly because some government contracts are let on a partisan basis; the pervasive role of government in modern American life has made it important for business firms to be on good terms with the major political groupings in the society. It seems unlikely that the cautious neutrality that characterizes the political activities of American business would be altered even by an ironclad constitutional rule against allowing politics to influence the contracting process.

And against the uncertain benefits of such a rule in promoting the values of the First Amendment must be set the unknown but potentially large costs. To attempt to purge government of politics to the extent implied by an effort to banish partisan influences from public contracting will strike some as idealistic, others as quixotic, still others as undemocratic, but all as formidable. Patronage in one form or another has long been a vital force in American politics. Civil service laws, laws—which though not invoked by the plaintiff may be applicable here, see Ill.Rev.Stat.1981, ch. 24, ¶¶ 8–9–1, 8–10–3, 8–10–10, 9–2–100, 9–3–24—requiring public contracts to be awarded to the low bidder, laws regulating the financing of political campaigns, and decisions such as *Elrod* and *Branti* have reduced the role of patronage in politics but have not eliminated it entirely. The desirability of reducing it still further raises profound questions of political science that exceed judicial competence to answer; for a skeptical view of its desirability see, e.g., Johnston, Political Corruption and Public Policy in America 61 (1982). The consequences might be wholly desirable, or wholly undesirable, or some mixture of the two, but we are reluctant to tamper with political institutions when the competing First Amendment interests are as attenuated as they appear to be here.

A practical consideration reinforcing our caution is that a decision upholding a First Amendment right to have one's bid considered without regard to political considerations would invite every disappointed bidder for a public contract to bring a federal suit against the government purchaser. Civil service laws protect many public employees from being discharged; but it is in the nature of competitive bidding that every award of a contract involves the rejection of one or more other bids, each of which could form the basis of a federal suit under the theory advanced by the plaintiff in this case.

We are particularly reluctant to take so big a step in the face of the Supreme

Court's apparent desire to contain the principle of *Elrod* and *Branti*. As the Eighth Circuit pointed out in *Sweeney v. Bond, supra,* 669 F.2d at 542, 545, the plurality opinion in *Elrod,* after noting that "the general practice of political patronage" includes making "nonofficeholders ... the beneficiaries of lucrative government contracts for highway construction, buildings, and supplies," states: "Although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons." 427 U.S. at 353, 96 S.Ct. at 2680.

Some day the Supreme Court may extend the principle of its public-employee cases to contractors. But there are enough differences in the strength of the competing interests in the two classes of cases to persuade us not to attempt to do so.

AFFIRMED.