**Cynthia RUTAN, et al., Plaintiffs,**

v.

**The REPUBLICAN PARTY OF ILLINOIS, et al., Defendants.**

**No. 85–2369.**

United States District Court,
C.D. Illinois,
Danville Division.

July 11, 1986.

Andrew Leahy, Leahy & Leahy, Springfield, Ill., for plaintiffs.

Tom Sullivan, Jeffrey D. Colman, Sidney Schenkier, Edward J. Lewis, Jenner & Block, Chicago, Ill., for defendants, Thompson, Frech, Baise, Fleiscli, Hawkins, Wright, Reilly & Quigley.

Donna Dagnall, Martin Haxel, Asst. Attys. Gen., Springfield, Ill., Roger Flahaven, Asst. Atty. Gen., Chicago, Ill., for defendants.

Robert B. Oxtoby, Van Meter, Oxtoby & Funk, Springfield, Ill., for Republican Party of Ill., D. Adams.

Bruce Stratton, Springfield, Ill., for Irvin Smith.

## ORDER

BAKER, Chief Judge.

## INTRODUCTION

The defendants' motions to dismiss for failure to state a claim are pending before the court. Cynthia Rutan, Franklin Taylor, Dan O'Brian, Ricky Standefer, and James Moore filed this action on July 1, 1985, in their individual capacities and on behalf of six asserted plaintiff classes. These classes include: (1) all voters in the State of Illinois; (2) all taxpayers in the State of Illinois; (3) all employees of the State of Illinois who desire a promotion; (4) all employees of the State of Illinois who desire a transfer; (5) all employees of the State of Illinois who have been laid off but not rehired; and (6) all persons who desire employment with the State of Illinois.

The defendants include the Republican Party of Illinois, two Republican Party officials, Governor James R. Thompson, and seven former or current state government officials. The state officials, including Governor Thompson, are sued individually and in their official capacities. In addition, the defendant Greg Baise is sued as representative of a purported defendant class consisting of all "directors, heads or chief executive officers ... since February 1, 1981, of departments, boards, and commissions under the jurisdiction of the Governor of the State of Illinois." The defendant Lynn Quigley is likewise sued as a representative of a purported defendant class consisting of all "liaisons" between the Governor's Office of Personnel and the departments, boards, and commissions under the jurisdiction of the Governor since February 1, 1981.

## ALLEGATIONS

The gravamen of the plaintiffs' complaint is that the defendants allegedly have conspired to create an employment system whereby decisions regarding the hiring, promotion, transfer, and rehire from lay off of the State's approximately 60,000 employees under the jurisdiction of the Governor are "substantially motivated by political considerations." The allegations which pertain to the five named plaintiffs as individuals state that affiliation with the Republican Party is a key factor used in employment decisions made by the Governor's Office of Personnel.

The plaintiff Rutan, an employee of the Department of Rehabilitative Services of the State of Illinois, alleges that she applied for a promotion to a section of the department called Adjudicative Services. Rutan was not affiliated with the Republican Party at the time she sought promotion. She did not get the promotion. She alleges that the position was filled by someone who was less qualified but politically favored by the Governor's Office of Personnel.

Rutan alleges she acquired a form distributed by the Republican Party Precinct Committeeman in her area which seems to be an application for promotion. The form is attached to the complaint as Exhibit B. The plaintiff does not allege that she was called upon to complete and to submit the form in connection with her application for promotion. This form seeks information regarding the applicant's vote in the pri-

mary elections. It also asks about the applicant's membership in the Lincoln Club of Sangamon County. Finally, it asks whether the applicant would be willing to become active in the Sangamon County Republican Foundation and to work in the precinct for candidates the Central Committee recommends as qualified for local, state, and national offices. The final line of the application requires a notation of approval or disapproval by the precinct committeeman.

The plaintiff Taylor currently works in Fulton County for the Illinois Department of Transportation. He applied for a promotion in July of 1983. A less qualified and less senior person got the promotion. This less senior person had received the support and approval of the Fulton County Republican Party. The plaintiff Taylor later requested a transfer to Schuyler County. He was advised that the transfer could not be granted because the Republican Party in Fulton and Schuyler Counties had not approved the request. Taylor is not an active supporter of the Republican Party.

The plaintiff Standefer was a temporary employee in 1984. In November of 1984 he and five other people were laid off. The five other people were offered other jobs. Standefer alleges they were offered other jobs because they had Republican Party support. Standefer voted in the Democratic Party primary, presumably in 1984.

The plaintiff O'Brien worked for the State of Illinois at the Lincoln Development Center of the Department of Mental Health and Developmental Disabilities. O'Brien was laid off in 1983. He was notified in 1984 that he was being recalled to work and that his recall depended upon an approval from the Governor's office in Springfield. In mid–1985 the plaintiff was told that the recall was not approved in Springfield. The plaintiff finally secured a position with the State of Illinois, but only after he obtained the support of the Chairman of the Republican Party of Logan County. The plaintiff had voted only once in a primary election, in a Democratic primary.

The plaintiff Moore applied for a position with the State of Illinois. In August of 1980, Moore received a letter from his Republican State Representative. This letter is attached to the complaint as Exhibit C. The letter explains to Moore that he should get the endorsement of the Republican County Chairman and the Precinct Committeeman to further his application. The plaintiff alleges that while he was attempting to get a position with the state, Victor English, the son of the current Chairman of the Polk County Republican Central Committee, Brian Burk, the son-in-law of the Vice-Chairman of the Precinct Committeewoman of the Polk County Republican Central Committee, and Dorris Thomas, Moore's Republican Precinct Committeeman, have all been hired by the state government in positions for which the plaintiff Moore was qualified.

## DISCUSSION

### I.

The plaintiffs contend that the defendants' use of political considerations in employment decisions offends the plaintiffs' constitutional rights to free speech and association, due process and equal protection, and to a republican form of government. The strongest of the plaintiffs' claims is that the defendants' conduct violates the plaintiffs' First Amendment rights to free speech and association. The plaintiffs rely on the Supreme Court decisions of *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and for the proposition that public employment cannot be conditioned on an employee's affiliation with a particular political party that is in power. The Supreme Court in both *Elrod* and *Branti* declared that the practice of firing employees who were hired by a supplanted administration violated the First Amendment.

The defendants respond that the *Elrod* and *Branti* decisions are limited to political firings; they do not apply to the use of political considerations in hiring, pro-

moting, transferring, and rehiring state employees. They argue that the use of political considerations in aspects of public employment other than punitive actions like discharge is constitutionally permissible. The court is persuaded that the defendants' position is correct and will dismiss the Section 1983 claims alleging violations of the First Amendment for the following reasons.

The Supreme Court explicitly limited its rulings in both *Branti* and *Elrod* to political firings. *Branti v. Finkel*, 445 U.S. 507, 513 n. 7, 100 S.Ct. 1287, 1292, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns*, 427 U.S. 347, 353, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976). Mindful of this, federal courts have rejected attempts to extend *Elrod* and *Branti* beyond firings or similar punitive personnel actions.[1] Two courts of appeal have recently considered the question of the use of patronage. *Avery v. Jennings*, 786 F.2d 233 (6th Cir.1986), and *LaFalce v. Houston*, 712 F.2d 292 (7th Cir.1983), *cert. denied* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984). These courts refused to extend *Elrod* and *Branti* to prohibit the use of political factors in awarding contracts and in hiring public employees.

In *LaFalce v. Houston*, 712 F.2d 292 (7th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984), the Seventh Circuit affirmed the district court's dismissal of a complaint in which a contractor alleged he had been improperly denied a public contract based upon political considerations. The court in *LaFalce* reasoned that *Elrod*'s *per se* prohibition of political firings is based on the principle "that public employees would be discouraged from expressing their true political views if it might cost them their jobs." *Id.* at 293. In rejecting plaintiff's claim that unsuccessful contractors similarly would be dis-

couraged from expressing their political beliefs, the court considered the extent to which patronage practices interfere with the expression of political views. *Id.* at 294. The court found the "extent of the likely interference" insufficient to raise constitutional concerns.

> If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent ..., it is not the end of the world for him; there are other government entities to bid to, and private ones as well. *It is not like losing your job.*

*Id.* (emphasis added). Moreover, the court expressed grave doubts about the wisdom of a constitutional ruling forbidding the use of political considerations in this context.

> Against the uncertain benefits of such a rule in promoting the values of the First Amendment must be set the unknown but potentially large costs. To attempt to purge government of politics to the extent implied by an effort to banish partisan influences from public contracting will strike some as idealistic, others as quixotic, still others as undemocratic, but all as formidable. Patronage in one form or another has long been a vital force in American politics.

*Id.*

The court, referring to the plaintiff's claim to protection under *Elrod*, concluded:

> We are particularly reluctant to take so big a step in the face of the Supreme Court's apparent desire to contain the principle of *Elrod* and *Branti*....

*Id.* at 294–95.

The defendants also rely on *Avery v. Jennings*, 786 F.2d 233 (6th Cir.1986), in which the court decided whether *Elrod* and

---

1. Some courts have extended *Elrod* where the adverse employment action is essentially punitive or amounts to a dismissal. *See, e.g., DeLong v. United States*, 621 F.2d 618, 624 (4th Cir.1980) (punitive reassignment and transfer "tantamount to dismissal"). *But cf. Cullen v. New York State Civil Service Commission*, 435 F.Supp. 546 (E.D.N.Y.) *appeal dismissed* 566 F.2d 846 (2nd Cir.1977) (court refused dismissal

because the plaintiffs alleged denial of promotions for failure to make a one percent of salary contribution to a political party). However, commentators have urged federal courts to extend *Elrod* and *Branti* to personnel actions other than discharge. *See, e.g.,* Hoffinger, *First Amendment Limitations on Patronage Employment Practices*, 49 U.Chi.L.Rev. 181 (1982).

*Branti* extend to political *hiring* decisions by elected officials. In *Avery,* the plaintiff brought a class action suit alleging that her political beliefs had disqualified her from consideration for public employment. The district court granted summary judgment in favor of the defendants. On appeal, the Sixth Circuit affirmed, concluding that *Elrod* and *Branti* do not prohibit the practice of hiring applicants who are friends or are referred by political allies. 786 F.2d at 237.

The defendants' reliance on *Avery* is somewhat misplaced. *Avery* was procedurally quite different from this case. In *Avery,* both the District Court and the Court of Appeals relied on evidence submitted by the parties to conclude that a First Amendment cause of action had not been established. This court must rule on a motion to dismiss, relying solely upon the allegations of the complaint. When considering a motion under Federal Rule of Civil Procedure 12(b)(6), a court must deem all well-pleaded allegations of the complaint admitted, and resolve every reasonable doubt in favor of the pleader. *See Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969), *Hanrahan v. Lane,* 747 F.2d 1137, 1139 (7th Cir.1984); *Burns v. Paddock,* 503 F.2d 18, 25 (7th Cir.1984); *Williams v. Lane,* 548 F.Supp. 927, 929 n. 2 (N.D.Ill.1982). The complaint should not be dismissed unless it appears that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *See also Jenkins,* 395 U.S. at 422, 89 S.Ct. at 1849; *Hanrahan,* 747 F.2d at 1139.

Despite procedural differences, however, *Avery* provides a helpful interpretation of the current law on the use of political factors in hiring. The Sixth Circuit urges that federal courts not become involved in a review of hiring decisions made by public employers:

> Although the informal hiring practice in question here places some burden on the associational rights of prospective job applicants, that burden does not rise to the level of constitutional deprivation. Under the first amendment, government actions receive a much higher degree of scrutiny when those actions are aimed at restricting the content of speech than when the burden on the protected activity is an incidental consequence of other legitimate governmental concerns. *Compare Keyishian v. Board of Regents,* 385 U.S. 589 [87 S.Ct. 675, 17 L.Ed.2d 629] (1967) (invalidating statute restricting employment of communists) *with Kovacs v. Cooper,* 336 U.S. 77 [69 S.Ct. 448, 93 L.Ed. 513] (1949) (upholding limits of use of sound trucks in political campaigns) and *Prince v. Massachusetts,* 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645] (1944) (upholding application of child labor laws to use of children for distribution of religious literature). *See also* L. Tribe, American Constitutional Law, 580–81 (1978). In the instant case the officials in question had no firm rule, regulation, or established policy foreclosing employment based on political affiliation, but their hiring system had the effect of giving weight to party affiliation.

There is a significant difference between a patronage system that intentionally uses a strict political test as the standard for hiring or firing decisions, as in *Elrod, Branti, Keyishian,* [*United Public Workers v.*] *Mitchell* [330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947)], and *Wieman* [*v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952)], *supra,* and a patronage system that relies on family, friends, and political allies for recommendations. The former has a single end tied to political belief. The latter has multiple purposes—finding good employees, maintaining and extending personal and political relationships, creating cooperation and harmony among employees. The former is designed to call attention to political differences and punish those who differ. The latter is designed to enhance the official's performance and political appeal. The former requires no weighing or balancing of factors by the elected official or the reviewing court.

The latter takes into account many factors and nuances, conscious and unconscious, and its review would involve the federal courts in the complex and subjective hiring practices of elected officials at every level of government.

*Elrod* and *Branti* did not affect normal patronage hiring systems in the United States because they were strict political affiliation discharge cases. Invalidation of informal hiring networks like those in the instant case because they lead to disproportionate representation of one political party or to a disproportionate number of liberals or conservatives would require abolition of the hiring systems for office workers and thousands of legislative, executive, and judicial offices across the country. In order to prevent patronage under the present systems, the courts would have to constitutionalize a civil service system and oversee its operation. There is no precedent for this reading of the First Amendment. Balancing the harm sought to be remedied—the tendency of the present systems to prefer particular political parties in different offices—against the legitimate needs of elected officials to hire in some manner effective employees who will not be blind to the public nature of the work and the political needs of their employer, we conclude that the hiring systems used by the defendants did not abridge plaintiff's right of free speech under the First Amendment.

786 F.2d at 236–37. *See also Illinois State Employees Union, Council 34, etc. v. Lewis,* 473 F.2d 561, 576 (7th Cir.1972) (Campbell concurring).

The defendants also rely on *Messer v. Curci,* 610 F.Supp. 179 (E.D.Ky.1985), *appeal pending,* No. 85–5626 (6th Cir.) in which two seasonal workers challenged a city department's decision not to rehire them. The court treated the plaintiffs' allegations as a hiring decision and concluded that *Elrod* did not support plaintiffs' claims for relief. The court noted that Supreme Court decisions have reflected a desire to "restrict the scope of First Amendment litigation of public employees." 610 F.Supp. at 184, citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The plaintiffs, however, allege more than a failure to hire. The allegations include instances in which political affiliation was taken into account in promoting, transferring, and rehiring laid off state employees. The court takes note of the plaintiffs' reliance on cases in which various employment practices were used to punish certain plaintiffs for the exercise of their First Amendment rights. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss at 18. *See also Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.), *cert. denied* —— U.S. ——, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *Bart v. Telford,* 677 F.2d 622 (7th Cir. 1982); *McGill v. Board of Education,* 602 F.2d 774 (7th Cir.1979); and *Muller v. Conlisk,* 429 F.2d 901 (7th Cir.1970).

These cases are inapposite for two reasons. First, they do not involve allegations that political patronage deprived plaintiffs of their First Amendment rights. Second, unlike the case at bar, the plaintiff employees in the foregoing cases suffered punitive personnel actions in retaliation for their exercise of protected First Amendment speech. Similarly, both *Hasenstab v. Board of Fire and Police Commissioners,* 71 Ill.App.3d 244, 27 Ill.Dec. 524, 389 N.E.2d 588 (5th Dist.1979), and *Dendor v. Board of Fire and Police Commissioners,* 11 Ill.App.3d 582, 297 N.E.2d 316 (1st Dist. 1973) involved allegations of direct retaliation for the exercise of employees' First Amendment rights.

The plaintiffs' allegations are too vague and inconclusive to support a scenario of punitive actions based solely upon political belief. Cynthia Rutan does not allege that her failure to be promoted was directly related to her own political activity. *Cf. Bart v. Telford,* 677 F.2d 622 (7th Cir.1982) (complaint stated claim because of allegations that plaintiff was being retaliated against for her political speech) and *Blameuser v. Andrews,* 630 F.2d 538 (7th Cir. 1980) (unsuccessful applicant for ROTC

promotion stated claim because denial linked to his Nazi writings). Franklin Taylor alleges that his request for a transfer had to be approved by the Republican Party Chairman. He does not allege that he was being punished for speaking out on an issue of public concern. *Cf. McGill v. Board of Education*, 602 F.2d 774 (7th Cir.1979) (teacher stated claim based upon transfer after she voiced complaints and "stirred up trouble"). Ricky Standefer suggests that others were given jobs because they had Republican Party support. He does not allege that he was laid off because he had taken a political position. Dan O'Brien claims that others who were less qualified than he were given jobs and he suggests it was because of their political connections. Again, there is no direct allegation of retaliation or punishment due to an expression of political belief. Finally, James Moore alleges that his employment prospects were explicitly conditioned on political sponsorship. He then alleges that others who were politically connected were hired for positions that Moore was qualified to fill, but not necessarily positions for which he had applied. There is no allegation that James Moore suffered retaliation or punishment for maintaining a certain political position.

The plaintiffs argue that their allegations should withstand dismissal because the complaint is essentially a duplicate of the complaint in *Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315 (N.D.Ill.1979), *appeal pending, Shakman v. Dunne*, Nos. 85–1870, 85–1911, 85–1912 (7th Cir.). In *Shakman*, the plaintiffs successfully challenged patronage practices in Cook County, Illinois. However, the *Shakman* case is quite different from the plaintiffs' case here. In *Shakman*, Judge Bua explicitly declined the invitation to rule on the constitutional rights of applicants for state employment. Standing to proceed was granted only to candidates and voters in Cook County, Illinois. 481 F.Supp. at 1327. Yet Judge Bua appears to read *Elrod* as extending to hiring decisions. *See Shakman*, 481 F.Supp. at 1327–28 n. 9 (where court took position

that the Supreme Court intended that *Elrod* extend to hiring decisions). This court disagrees, because such an extension is at odds with the more recent rulings in *LaFalce, Avery,* and *Messer*.

■ The plaintiffs also assert their First Amendment claims as taxpayers and as voters. They incorrectly cite to *Shakman* as support for their claims as taxpayers. Judge Bua found no taxpayer standing, noting that taxpayers may challenge only those expenditures that operate to restrict the exercise of the taxing and spending power. *Id.* at 1322 n. 1. *See United States v. Richardson*, 418 U.S. 166, 173, 94 S.Ct. 2940, 2944, 41 L.Ed.2d 678 (1974) and *Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968). The plaintiffs fail to make such a claim.

Judge Bua did find that Shakman had standing as a candidate for office and as a voter. 481 F.Supp. at 1322. He explicitly rested his ruling on a finding that the challenged patronage employment practices directly burdened constitutionally protected interests of candidates for political office. *Id.* The plaintiffs here, however, allege no more than the observation that the employment practices "create a significant political *effort*" in favor of the defendant Thompson and his political allies. They fail to present any allegations or even argument suggesting that the employment practices *affect election outcomes.* Without a more direct link to the defendants' conduct, any injury plaintiffs suffer is insufficient to confer standing as voters. *See Winpisinger v. Watson*, 628 F.2d 133, 137 (D.C.Cir.1980) (Kennedy supporters had no standing to challenge Carter's patronage hiring). The plaintiffs' conclusions fail to state a claim for a violation of the First Amendment rights of voters in the State of Illinois.

The plaintiffs nonetheless urge this court to allow the case to proceed until the defendants can offer a compelling reason for use of political considerations in hiring. That balancing test, the plaintiffs argue, is required by a line of First Amendment

decisions beginning with *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) and applied in *Elrod,* 427 U.S. at 363, 96 S.Ct. at 2684. The *Keyishian* decision and other cases relied upon by the plaintiffs provide no guidance on the issues raised in this case. The general principles of First Amendment jurisprudence, and many of the cases cited by the plaintiffs, were distinguished by the Sixth Circuit in *Avery:*

> Under the first amendment, government actions receive a much higher degree of scrutiny when those actions are aimed at restricting the content of speech, than when the burden on the protected activity is an incidental consequence of other legitimate governmental concerns.

786 F.2d at 236. Here, as in *Avery,* any incidental effect that might flow from the use of political considerations in employment decisions does not trigger the analysis of *Keyishian* and other cases that involve direct restrictions on speech. Furthermore, the principal cases relied upon by the plaintiffs involve the dismissal of a public employee for the exercise of his constitutionally protected speech. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). In the instant case, there is no allegation that the plaintiffs were discharged or threatened with discharge.

## II.

■ The plaintiffs have conceded in their memoranda and in oral argument that certain allegations of civil rights violations in their complaint do not state a claim. First, the plaintiffs concede that their complaint is generally insufficient under *Grimes v. Smith,* 776 F.2d 1359 (7th Cir.1985). The plaintiffs cannot recover under section 1985(3) for damages caused by a political but wholly non-racial conspiracy among private parties. *See* Plaintiffs' Memorandum in Opposition to Motion to Dismiss at 38.

■ Second, the plaintiffs concede that their allegation that the Guarantee Clause, Article IV, Section 4 of the United States Constitution, has been violated by the defendants' actions is also without basis. Since the decision in *Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), the Supreme Court has repeatedly held that whether the Guarantee Clause has been violated is not a judicial, but a political question. Enforcement of this clause is for Congress and not for the courts. *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Mountain Timber Co. v. Washington,* 243 U.S. 219, 234, 37 S.Ct. 260, 263, 61 L.Ed. 685 (1917). The Supreme Court has refused to resort to the Guarantee Clause as a source of a constitutional standard for invalidating state action. *Baker v. Carr,* 369 U.S. 186, 223, 82 S.Ct. 691, 713, 7 L.Ed.2d 663 (1962). Clearly, the plaintiffs' allegations fail to state a cause of action regarding a violation of the Guarantee Clause.

■ In addition, the court is persuaded that the plaintiffs fail to allege a cause of action under the Due Process Clause of the Fourteenth Amendment. The plaintiffs claim that the use of political considerations in employment decisions violates their right to due process under the Fourteenth Amendment. To determine whether the due process requirements of the Fourteenth Amendment apply in the first place, the court must look to the nature of the interests at stake. *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). The plaintiffs must establish that the interests they assert are within the ambit of the Fourteenth Amendment's protection of property. *Id.* The plaintiffs attempt to satisfy this prerequisite by claiming that the Illinois Personnel Code, Ill.Rev.Stat. ch. 127, § 63b101 (1985) *et seq.* gives them "certain property interests" which the employment process allegedly disregards. However, the law has long been settled in Illinois that, at least in situations other than discharge, a public employee has no property right in public employment which falls within the protection of the Due Process

Clause of either the state or federal constitution. *Levin v. Civil Service Commission,* 52 Ill.2d 516, 521, 288 N.E.2d 97 (1972).

■ The plaintiffs' allegation that the Equal Protection Clause of the Fourteenth Amendment has been violated by the defendants' actions also fails to state a claim. The plaintiffs seem to contend that the alleged employment system permits state officials to obtain political support for Republicans statewide, while Democratic office holders in Cook County are restrained from doing so by court order, including a 1972 consent decree in *Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315 (N.D.Ill.1979) *appeal pending, Shakman v. Dunue,* Nos. 85–1870, 85–1911, 85–1912 (7th Cir.). There is no standing for plaintiffs' challenge. The plaintiffs do not state how restrictions on state officials in Cook County cause damage to the plaintiffs as voters, employees, or applicants in areas outside of Cook County. This failure flaws their claim. The fact that public officials in the Northern District of Illinois have entered into a consent decree which limits their discretion as public employers does not give rise to an equal protection claim merely because public officials in other parts of the state are not similarly restrained. The Equal Protection Clause of the Fourteenth Amendment protects individuals from state actions which purposefully discriminate against those who are entitled to be treated similarly. *McCalvin v. Fairman,* 603 F.Supp. 342 (C.D.Ill.1985). If any disparate treatment results from orders entered by a court, it disadvantages those parties who are restrained by the court order, not those who are left unrestricted.

The plaintiffs allege in their memoranda but not in their complaint that friends of the state administration are treated differently from strangers in employment matters. If this argument is an attempt to bring the plaintiffs under the umbrella of the *Shakman* ruling, it fails. Such allegations do not show that the employers have singled out a particular group for disparate treatment and selected a course of action for the purpose of causing adverse political effects on the identifiable group.

■ Finally, the plaintiffs also concede that *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) bars all but one of their claims under state law. In *Pennhurst,* the Supreme Court held that the Eleventh Amendment bars a suit by a citizen against a state without a state's consent or Congressional abrogation of the state's immunity. "The state is the real, substantial party in interest" whether the suit seeks damages or injunctive relief. Applying that rule to the case at bar, the plaintiffs' suit is undoubtedly against the State of Illinois. The plaintiffs have sued the state officials, including the Governor, in their official capacities. Moreover, the plaintiffs purport to sue two additional defendant classes, including the heads of all state departments, boards, and commissions under the jurisdiction of the Governor. The damage request if granted would be borne by the State under Ill.Rev.Stat. ch. 127, § 1302 (1983), and thus, clearly "would expend itself on the public treasury". *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908. Certainly the plaintiffs' request that a receivership be instituted to control and operate the hiring and promotion system of the State's fifty departments, boards, and commissions under jurisdiction of the Governor invades the province of the State.

■ The plaintiffs argue that their state law claim seeking the restoration of funds expended to operate the Governor's office of personnel is not barred by the Eleventh Amendment because the plaintiffs are acting on behalf of the state. *See* Plaintiffs' Memorandum at 37. This court will not address that argument, because all state claims must be dismissed in the absence of federal jurisdiction. Because the court must dismiss all of the federal causes of action presented by the plaintiff, this remaining state claim must be dismissed as well. *See United Mineworkers v. Gibbs,*

383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

IT IS THEREFORE ORDERED that the defendants' motions to dismiss the plaintiffs' complaint is granted. The plaintiffs' complaint is dismissed with prejudice. The Clerk shall enter judgment accordingly.